**DALWORTH TRUCKING COMPANY and Billy Halbert, Appellants,**

v.

**Donnell BULEN, Individually and as Next Friend for Ricky Oliver Bulen, III, Appellee.**

No. 06–95–00100–CV.

Court of Appeals of Texas, Texarkana.

Submitted March 5, 1996.

Decided April 24, 1996.

Rehearing Overruled July 16, 1996.

David M. Pruessner, Cherl K. Harper, Fletcher & Springer, Dallas, for Appellants.

John Howie, Howie & Sweeney, L.L.P., Dallas, Jack K. Robinson, Jr., Howie & Sweeney, L.L.P., Greenville, Barbara Rosenberg, Fred Misko, Jr., P.C., David Weiner, Dallas, for Appellees.

William C. Terry, Bonham, Atty. Ad Litem, for Ricky O. Bulen, III.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

CORNELIUS, Chief Justice.

Donnell Bulen and Ricky Bulen, III sued Dalworth Trucking Company and Billy Halbert to recover damages because of the death of Ricky Bulen, Jr. in a truck collision. The jury found for the Bulens generally, and the court rendered judgment against Dalworth and Halbert for $1.3 million compensatory damages and against Dalworth for $1 million punitive damages.

Dalworth and Halbert do not contest the award of compensatory damages to Ricky Bulen, III. On appeal they contend that there is legally insufficient evidence to support a recovery of punitive damages; the punitive damage award is excessive; the award of damages to Donnell Bulen cannot be sustained because the jury's finding that she was the common law wife of Ricky Bulen, Jr. is not supported by legally or factually sufficient evidence; the court erred in admitting certain evidence on the issue of common law marriage; and the fee of $100,000.00 awarded to the attorney ad litem for Ricky Bulen, III is excessive. We overrule these contentions except as to the attorney ad litem's fee. We modify the judgment to reduce the ad litem fee to $40,000.00. As modified, the judgment is affirmed.

Billy Halbert was a truck driver for Dalworth. On October 6, 1994, Halbert ran a stop sign at the intersection of State Highways 121 and 11 in Fannin County and collided with Ricky Bulen, Jr.'s pickup truck. Bulen died instantly.

The jurors found that Halbert's and Dalworth's negligence proximately caused the accident and attributed forty percent of the negligence to Halbert and sixty percent to Dalworth. The jurors also found that Dalworth was grossly negligent, but they failed to find that Halbert was grossly negligent. They also found that Donnell Bulen, who had previously divorced Ricky Bulen, Jr., was his common law wife.

## I. GROSS NEGLIGENCE

Dalworth and Halbert contend that there is no evidence to support the jury's finding that Dalworth was grossly negligent. They do not contend that the evidence was factually insufficient.

In reviewing a no evidence point, we consider only the evidence and inferences that, viewed in their most favorable light, tend to support the finding, and we disregard all evidence and inferences to the contrary. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex. 1987). If any evidence of probative force supports the finding, we must overrule the point and uphold the finding. This traditional no evidence standard applies to gross negligence findings. *See Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 20 (Tex.1994); *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex.1981).

"Gross negligence" means more than momentary thoughtlessness, inadvertence, or error of judgment; it means such an entire want of care that establishes that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected. TEX.CIV.PRAC. & REM. CODE § 41.001(5);[1] *Transportation Ins. Co. v. Moriel*, 879 S.W.2d at 20. Gross negligence has both objective and subjective elements: (1) when viewed from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the extreme

---

1. Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex.Gen.Laws 44, *amended by* Act of April 11, 1995, 74th Leg., ch. 19, § 1, 1995 Tex.Gen.Laws 109.

risk involved but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d at 21. Extreme risk is a function of both the magnitude and the probability of the anticipated injury. *Id.* at 22.

■ The court instructed the jurors that in order for them to find Dalworth grossly negligent they must find that someone employed by Dalworth in a managerial capacity and who was acting in the scope of that managerial capacity was grossly negligent. *King v. McGuff,* 149 Tex. 432, 234 S.W.2d 403, 405 (1950).

The evidence showed that Dalworth used a software system, Rapid Log, to analyze data from its drivers' daily logs to determine whether the drivers were complying with federal regulations and company safety policies. The system would generate letters automatically to the drivers, telling them when they had violated company policy. Dalworth's safety manager, Richard Lair, testified that the company policy permitted its drivers to drive an average of fifty miles per hour in ten hours of driving time within a twenty-four-hour period. From July 1 to October 6, 1994, the date of the accident, Rapid Log reports showed that Halbert committed fifty-five violations of company speed policies,[2] six violations of company hours violations, and one missing log violation. Federal regulations restrict driving hours to no more than seventy hours in eight days. Five of the hours violations occurred within the week preceding the accident: (1) On October 1 Halbert drove 7.75 hours over the ten-hour limit in a twenty-four-hour period. (2) Four hours of that also was a violation of the rule that prohibited driving with more than fifteen hours on duty. Company policy listed as a violation driving after being on duty for more than fifteen hours in a twenty-four-hour period. On-duty hours could include driving hours and nondriving hours. (3) Hal-

bert's log shows that he drove ten hours on October 3, violating the seventy-hour rule by six hours. It violated company policy for a driver to drive more than seventy hours in eight days. (4) On October 4 he drove ten hours, violating the seventy-hour rule by 4.25 hours. (5) On October 5, he drove another eight hours, violating the seventy-hour rule by 4.25 hours.

There was testimony that Halbert failed to log in pretrip and posttrip inspections and that he and other Dalworth drivers were driving more hours than they were logging in their records, so-called "rolling trips." Rolling trips allowed Dalworth to bill the customer for more miles and allowed drivers to be paid for more miles than company time and speed policies allowed. There was testimony that Dalworth had a "three strikes and you're out" policy with its drivers, which provided that after a driver accumulated three safety violations, the company would fire him. Halbert, however, was not terminated, disciplined, or admonished, despite his safety violations. Dalworth did not even send cautionary letters to Halbert[3] concerning his violations.

The Bulens argue that Dalworth's failure to discipline Halbert after safety violations meets both the objective and subjective standards for gross negligence. Specifically, they argue that Dalworth, in failing to terminate Halbert or discipline him for his safety violations when it knew that those violations might cause him to have an accident, was grossly negligent.

Dalworth showed that Halbert had a safe overall driving record. In his entire thirty-two-year driving history, he had never been involved in an accident involving personal injuries. Once he had hit some horses. Once he had bumped a pole while maneuvering a trailer into a tight loading dock. Once he a collided with a truck leaving a loading

---

**2.** Of the 55 instances where Halbert violated company speeding regulations, five were for driving over 60 miles per hour, with the highest speed being 62.5 miles per hour. The remainder of the violations were for speeds over 55 miles per hour but not above 60 miles per hour. Dalworth allowed its drivers to drive an average of 50 miles per hour in ten hours of driving time within a 24-hour period. Anyone who drove more than 500 miles in a 24-hour period violated the policy.

**3.** Halbert worked for his son, who leased the truck to Dalworth Trucking. Under federal regulations, however, Halbert was for most purposes a company employee.

dock. He had only one speeding ticket in the past year. Dalworth also points out that many of the "violations" flagged by the Rapid Log software are technical and "paperwork" violations. For example, Dalworth argues, Rapid Log notes a violation if a truck goes over fifty miles per hour even though the speed limit is fifty-five.[4] Although the Bulens criticized Dalworth for "millions" of safety violations reported by Rapid Log, most of the violations were technical violations of the recordkeeping rules and had no causal relationship to the collision. The Bulens concede that Halbert's violations of safety regulations must have caused or contributed to the collision in order for Dalworth's negligence in failing to supervise or terminate Halbert to be a proximate cause of the collision. *See Durham Transp., Inc. v. Valero*, 897 S.W.2d 404 (Tex.App.—Corpus Christi 1995, writ denied).

Dalworth argues that the factors set out in *King v. McGuff, supra,* require the jury to find that a corporate agent acted in a grossly negligent manner. Because the jury failed to find that Halbert was grossly negligent, it says, the jurors could not then make a gross negligence finding against Dalworth. This argument misses the point. It was not Halbert's gross negligence that the Bulens claim justifies punitive damages, but the alleged gross negligence of the company managers in failing to supervise, discipline, or terminate Halbert.

Although Dalworth was aware of many technical safety violations by Halbert, none but the excessive driving hours caused or contributed to the wreck or had any connection to it at all. All parties concede that speed had nothing whatsoever to do with the accident. *Durham Transp., Inc. v. Valero, supra.* As for the excessive driving hours, it is conceivable that a driver could be so fatigued by successive over-hours driving that he could lose some degree of alertness and perhaps fail to see a stop sign at all, or fail to see it in time to stop.

The evidence showed that Halbert drove only eight hours on the day preceding the accident; ten hours on the day before; and ten hours on the day before that. Evidence also showed, however, that according to the Rapid Log reports, Halbert had a long record of driving excess hours in violation of company policy and federal regulations. But on the day of the accident, Halbert was not fatigued; he had a good night's sleep before the day of the accident; he had a leisurely morning; he had several rest breaks during the day; and he had eaten lunch. The DPS officer who investigated the wreck concluded that driver fatigue was not a factor in the accident. Halbert himself did not attribute the wreck to driver fatigue.

Lair testified extensively. He investigated the accident and testified about Halbert's driving records as shown by Rapid Log and other company records. Although he testified that, during the times in question, he thought the Rapid Log was operating in a faulty manner, he conceded that Halbert had a long history of safety violations, including over-hours driving, rolling trips, and speed violations, in addition to missing log violations. He testified that company managers were aware of Halbert's over-hours violations; that over-hours driving and rolling trips cause driver fatigue; that fatigue from excessive driving is cumulative, i.e., it builds up to an almost inevitable loss of alertness in a driver; that he would give Halbert's overall driving record, as far as safety violations were concerned, a grade of "F"; that Halbert had over-hours driving violations on each of the four days preceding the wreck; that repeated safety violations by drivers create an extremely dangerous situation; that company managers knew about the situation but did not suspend, terminate, or admonish Halbert; and that to do anything less than that would be inexcusable. He also testified that he knew an accident was almost inevitable if management failed to vigorously enforce safety practices. Specifically, he testified as follows:

> Q. Would a violation summary like we see here on Exhibit 28, wouldn't you agree with me that a prudent course of action is

---

4. Although Lair testified that Rapid Log flagged as a violation any instance of a truck going over 50 miles per hour, the speeding violations discussed above involved instances of going over 55 miles per hour.

**734** ■

to pull the drivers that are doing this off the road?

A. Yes, sir.

Q. And to do anything less is inexcusable, isn't it?

A. That's correct.

Q. Why would that be inexcusable?

A. Well, it's an accident looking for a place to happen.

Lair testified that the safety violations shown by Rapid Log were unreliable because the system was faulty; that he did not think that Halbert's missing the stop sign was the sole cause of the accident; and that the company did care about the safe operation of its drivers. The jury, however, was entitled to resolve the conflicts in the testimony and believe such portions as they chose, as well as the legitimate inferences from all the testimony and circumstances.

We find from the recited facts some evidence that Dalworth's management knew of an extreme risk of impending harm from allowing Halbert to continue to drive without supervision, discipline, or admonishment, and that it nevertheless failed to do so in conscious disregard of the safety of those who might be affected. Thus, the jury's finding of gross negligence is supported by legally sufficient evidence. From all this evidence, the jury could have reasonably found that Halbert's cumulative safety violations caused a lack of alertness that contributed to his failure to see the stop sign in time to stop and avoid colliding with Bulen. Moreover, Dalworth's managers could reasonably foresee a similar consequence from their failure to suspend or discipline Halbert.

■ As for the amount of punitive damages, Dalworth says it is excessive. It contends that the award, $1 million, amounts to thirteen percent of the company, which it says is worth $7.5 million. Yet, there was evidence that Dalworth's gross revenue from 1994 was over $48 million. As for proportionality, the punitive damage award was $1 million and the compensatory damages $1.3 million, a ratio of .76 to 1. This is not

excessive. *See* Tex.Civ.Prac. & Rem.Code Ann. § 41.007.[5] We find that the award is not excessive when viewed in light of the considerations set out in *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981).

■ On the ordinary negligence issues, Dalworth and Halbert argue that only narrow exceptions exist in which some courts of appeals have found the entruster of a vehicle grossly negligent in entrusting the vehicle to an incompetent driver where the driver himself was found merely negligent and not grossly negligent.

The Bulens say, however, that this is not a negligent entrustment case.

■ The court instructed and questioned the jury on ordinary and gross negligence and on imputing the gross negligence to a corporation, not on negligent entrustment. 1 State Bar of Texas, Texas Pattern Jury Charges PJC 6.12 (negligent entrustment), 6.14 (imputing gross negligence to a corporation) (1987). Negligent entrustment requires (1) the entrustment of a vehicle by the owner (2) to an unlicensed, incompetent, or reckless driver (3) that the owner knew or should have known to be unlicensed, incompetent, or reckless; and (4) the driver's negligence on the occasion in question (5) proximately caused the accident. *Williams v. Steves Indus., Inc.,* 699 S.W.2d 570, 571 (Tex.1985).

The Bulens contend that negligent entrustment is an active tort, whereas much of the gross negligence alleged here is passive, in that Dalworth failed to take action to enforce its rules and policies. They further say Dalworth actively contributed to the gross negligence in overdispatching its drivers, in violation of law and company policy, thus causing Halbert to become fatigued and thus contributing to the accident. Moreover, they say, negligent entrustment would apply only to the initial entrustment of the vehicle, whereas this gross negligence was ongoing and continuous.

■ Negligent entrustment must be raised by the pleadings. *See, e.g., Minter v.*

---

5. Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex.Gen.Laws 45, *amended and renumbered by* Act of April 11, 1995, 74th Leg., ch.

19, § 1, 1995 Tex.Gen.Laws 111 (now Tex.Civ. Prac. & Rem.Code Ann. § 41.008 (Vernon Supp. 1996)).

*Joplin,* 535 S.W.2d 737, 739 (Tex.Civ.App.—Amarillo 1976, no writ); *Van Cleave v. Walker,* 210 S.W. 767, 768 (Tex.Civ.App.—Amarillo 1919, no writ); 8A TEX.JUR.3d *Automobiles* § 586 (1995). Here, the allegations of gross negligence on the part of Dalworth to go beyond negligent entrustment to include allegations of failure to control, failure to discipline, failure to terminate, and negligent overdispatching. No party complains of the submitted jury charge.

## II. COMMON LAW MARRIAGE

Although Ricky Bulen and Donnell Bulen had divorced before Ricky's death, the jury found that they had effected a common law marriage subsequent to their divorce. The common law marriage finding was a necessary component of Donnell Bulen's action for damages as one of Ricky's survivors.

Dalworth and Halbert contend that there is legally and factually insufficient evidence to support the common law marriage finding and that the trial court erred in allowing into evidence an affidavit and some testimony about spousal benefits in support of the common law marriage.

### A. Admissibility of Evidence

The Bulens offered an affidavit, headed "Proof Supporting Grant of Letters of Administration," signed by Ricky Bulen, Jr.'s father that had been filed in a probate proceeding. In the affidavit, Mr. Bulen said, "Decedent [Ricky Bulen, Jr.] entered into a common law marriage with Donnell Bulen on April 25, 1994." Dalworth and Halbert objected on grounds that the affidavit was hearsay, was a legal conclusion by a lay person, was not admissible as a prior inconsistent statement, and because it was a violation of due process to bind them by probate proceedings to which they were not parties. They argue that an affidavit may not be introduced at trial when a witness is available and his whereabouts are known.

The Bulens argue that the affidavit is not hearsay because the affiant testified at trial and was subject to cross-examination concerning the affidavit, and that the affidavit was consistent with his testimony and was offered to rebut an implied charge against him of recent fabrication. TEX.R.CIV.EVID. 801(e)(1)(B). After the document was admitted, the affiant was questioned about a pretrial deposition in which he had stated that he did not believe his son and Donnell Bulen had a common law marriage. The Bulens say this suggested that he had recently fabricated his common law marriage testimony.

[redacted] We agree that Bulen Sr.'s statement, while it could be construed as a legal opinion, was actually a lay person's opinion based on observations and not on special knowledge. It was relevant on the question of whether Ricky and Donnell Bulen held themselves out as husband and wife, one of the elements of a common law marriage. The existence or nonexistence of a common law marriage is a question of fact. *Reece v. State,* 772 S.W.2d 198, 200 (Tex.App.—Houston [14th Dist.] 1989, no pet.); *Faglie v. Williams,* 569 S.W.2d 557, 565 (Tex.Civ.App.—Austin 1978, writ ref'd n.r.e.); *Standish v. Standish,* 568 S.W.2d 731, 733 (Tex.Civ.App.—Waco 1978, no writ); 39 TEX.JUR.3d *Family Law* § 42 (1994).

Dalworth and Halbert argue that the evidence was unfairly prejudicial under TEX.R.CIV.EVID. 403 because it put before the jurors the probate court ruling that a common law marriage existed between Ricky and Donnell Bulen. The probate court's judgment, however, was not put before the jurors and was not admitted into evidence.

The Bulens argue that the affidavit merely duplicates other testimony offered from other witnesses who said Ricky and Donnell Bulen had held themselves out as husband and wife. These included Roxanne Booth, Donnell Bulen herself, Pat Hicks, Lisa Graham, and Timothy Cline.

[redacted] The affidavit was offered into evidence before the charge of recent fabrication was leveled, that is, it was offered on direct and not on rebuttal. Dalworth and Halbert specifically waived any complaint about the timing of the evidence, however. The affidavit is not hearsay under Rule 801(e)(1)(B).

[redacted] The trial court's decision about the admissibility of evidence is subject to an abuse of discretion standard of review. *LSR*

*Joint Venture No. 2 v. Callewart,* 837 S.W.2d 693, 698 (Tex.App.—Dallas 1992, writ denied); *Williams v. Union Carbide Corp.,* 734 S.W.2d 699, 703 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). To obtain reversal of a judgment based on the admission of evidence, the appellant must show the trial court's ruling was in error and the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. TEX.R.APP.P. 81(b); *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989).

The trial court did not abuse its discretion in admitting the affidavit. Moreover, the statement about the marriage merely duplicates other testimony from other witnesses about the putative marriage, so even if its admission was improper, the error was not harmful. TEX.R.APP.P. 81(b); *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d at 397.

■ As for the testimony concerning spousal benefits, Dalworth and Halbert argue on appeal that it was hearsay. At trial, however, they raised only relevancy complaints and so waived any hearsay complaints. TEX.R.CIV.EVID. 103(a)(1); *Abeyta v. Travelers Ins. Co.,* 566 S.W.2d 708, 710 (Tex. Civ.App.—Amarillo 1978, writ dism'd). They also argue that the testimony is irrelevant and unfairly prejudicial because the testimony, which suggested that Donnell Bulen was receiving spousal benefits from the workers' compensation insurance provider for Ricky's employer, suggested that the question of the alleged common law marriage had already been decided.

■ Dalworth introduced into evidence Ricky Bulen, Jr.'s insurance benefits card on which he listed his marital status as "divorced" and designated his mother, Sandra Bulen, and his son, Ricky III, as beneficiaries. Dalworth also questioned Donnell Bulen about Ricky's assertions on his insurance benefits card. She then testified she was receiving spousal benefits from the insurance company in connection with Ricky's death. The Bulens also questioned James Jaubert, plant manager for Friendship Cable Television, Ricky Bulen, Jr.'s employer, about Donnell Bulen's spousal benefits.

Dalworth and Halbert argue that they introduced the insurance card only as a statement from Ricky Bulen, Jr. that he was divorced. The Bulens say that Dalworth suggested that the card was determinative of Ricky's marital status and so they elicited the testimony to counter that suggestion.

■ We agree that Dalworth "opened the door" for the Bulens to rebut the evidence. Even if it was error to admit the testimony, improper admission of evidence does not constitute reversible error when other competent evidence of the fact in question is in the record. TEX.R.APP.P. 81(b)(1); *Gee v. Liberty Mut. Fire Ins. Co., supra.*

■ Dalworth and Halbert also complain about the Bulens' questioning of Patty Lancaster, the officer manager for Friendship Cable Television and Betty Evans, a Bulen family friend, about Donnell Bulen's spousal benefits. When Dalworth objected to the evidence, the court sustained the objection and instructed the jurors to disregard the evidence. When Evans was questioned, they objected and the court sustained the objection. Because they received their requested relief, they preserved nothing for review.

### B. Sufficiency of the Evidence

■ Dalworth and Halbert challenge the sufficiency of the evidence to support the jury's verdict that a common law marriage existed. They contend that Ricky Bulen, Jr. and Donnell Bulen were divorced on April 25, 1994; that Ricky Bulen, Jr. stated on an insurance form he filled out about three months before his death that he was single; and that Donnell Bulen requested the divorce and is judicially estopped to deny its validity.

■ We detailed the standard of review for a no evidence point earlier. In reviewing a factual sufficiency point, we must determine that all the evidence, considering evidence both for and against the fact finding, is so weak or insufficient that the finding is manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); 6 McDONALD TEXAS CIVIL PRACTICE § 44:10[b] (rev.1992). The jury is the sole judge of a witness's credibility and of the weight to be given the witness's testimony. *Rego Co. v. Brannon,*

682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). The appellate court may not substitute its opinion for that of the jury merely because it could reach a different result. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex.1986).

█ A common law, or informal, marriage may be proved by evidence (1) that the parties agreed to be married, (2) that after the agreement, they lived together as husband and wife, and (3) that they represented to others that they were married. TEX.FAM. CODE ANN. § 1.91.[6] A proponent may prove an agreement to be married by circumstantial as well as direct evidence. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex.1993).

After the 1989 amendments to the Family Code, some commentators opined that the first element, the agreement to be married, would have to be proved by direct evidence. 33 DON KOONS, HANDBOOK OF TEXAS FAMILY LAW § 2.2 (Texas Practice 1996). But our Supreme Court ultimately held that the Legislature did not exclude finding a tacit agreement, but only required that the evidence of holding out be more convincing than before the 1989 amendment. *Russell v. Russell*, 865 S.W.2d at 932 (citing Joseph W. McKnight, *Family Law: Husband and Wife*, 44 SW.L.J. 1, 2–3 (1990)).

Donnell Bulen testified that she and Ricky Bulen, Jr. agreed to be husband and wife when they left the courthouse after their divorce proceedings. Lisa Graham, the Bulen's baby sitter, testified that Ricky told her in August 1994 that he and Donnell had an agreement to be married, and that he considered himself to be married to her. Misty Dill, a family friend, testified that Ricky said he may have been divorced on paper, but that did not change anything for him. Another family friend, Roxanne Booth, testified that Ricky and Donnell told her they were married after the divorce proceeding. She said that Ricky told her that he had gotten the divorce to satisfy his mother. Booth testified that Ricky's mother was pressuring him and Donnell to go ahead with the divorce because they had already "spent money" on the divorce and because she, the mother, had

"probably helped them spend money on it." The evidence showed that Ricky and Donnell lived together and held themselves out as married after the divorce. The evidence of cohabitation is uncontroverted.

As for presenting themselves as husband and wife, Booth testified she heard both Ricky and Donnell say that they were married. Dill and Graham testified that Ricky told them he and Donnell were married. Bobby Miller, a family friend, Pat Hicks, their landlord, and Robby Carney, a hunting companion, all testified that Ricky referred to Donnell as his wife. Ricky's father testified that his son and Donnell continued to represent themselves as Mr. and Mrs. Bulen. Moreover, Ricky's parents, in the information they gave to the funeral home and newspaper, indicated that Ricky and Donnell were married.

Dalworth and Halbert argue that, in addition to the divorce decree and the insurance form, Ricky Bulen's father testified in a deposition that his son told him he continued living with Donnell only for convenience so that he could see his son, Ricky III, every day and that he planned to move out.

Even if Donnell Bulen is judicially estopped to deny the divorce's validity at the time it was rendered, that does not dispose of the common law marriage question. There was ample evidence that, after the divorce, Ricky and Donnell agreed to be married again. She may have been mistaken about the effectiveness of the divorce decree, but so long as she and Ricky met the requirements of a common law marriage sometime after the divorce and before he died, they were capable of entering into a new marriage after the acknowledged divorce.

Much of the evidence about the agreement and the holding out is from either an interested party, Donnell, or from family or friends of Ricky and Donnell. Although there is evidence controverting it, the jurors have the right to judge the credibility of the witnesses and the weight of the evidence. There is sufficient evidence that, if believed, supports the jury finding of common law marriage.

---

6. *Amended by* Act of May 24, 1995, 74th Leg., ch. 891, § 1, 1995 Tex.Gen.Laws 4404.

## III. ATTORNEY AD LITEM FEE

Dalworth and Halbert challenge the amount of the fee awarded to the attorney ad litem. They contend there is insufficient evidence to support a fee of $100,000.00, and therefore it is excessive.

■ A trial court shall allow a reasonable fee to a guardian ad litem appointed to represent a child. Tex.R.Civ.P. 173. The amount of the fee is in the trial court's sound discretion, and absent evidence illustrating a clear abuse of discretion, a reviewing court will not set aside the allowance. *Simon v. York Crane & Rigging Co.*, 739 S.W.2d 793, 794 (Tex.1987). A trial court abuses its discretion in its allowance if the proponent produces no or insufficient evidence to support the allowance.[7] *Rio Grande Valley Gas Co. v. Lopez*, 907 S.W.2d 622, 624 (Tex.App.—Corpus Christi 1995, no writ); *Brown & Root U.S.A., Inc. v. Trevino*, 802 S.W.2d 13, 16 (Tex.App.—El Paso 1990, no writ). In determining the reasonableness of an attorney's fee, the trial court may consider the time and labor involved, the nature and complexities of the case, the amount of money involved, the attorney's responsibilities, whether the attorney lost other employment because of the appointment, the benefits the client received, contingency or certainty of compensation, and whether the employment is casual or for an established or constant client. *Valley Coca–Cola Bottling Co. v. Molina*, 818 S.W.2d 146, 149 (Tex.App.—Corpus Christi 1991, writ denied); *Alford v. Whaley*, 794 S.W.2d 920, 926 (Tex.App.—Houston [1st Dist.] 1990, no writ). A reviewing court may look at the record and draw on the common knowledge of the court justices and their experience as lawyers and judges to view the matter in the light of the testimony, the record, and the amount in controversy. *Alford v. Whaley*, 794 S.W.2d at 925.

■ Bill Terry, the ad litem, and David Turner, an attorney who recommended that the court appoint Terry, testified that Terry participated in a ten-day trial and attended depositions, conferences, and mediation. Terry testified that although he submitted a time statement listing some 207 hours, he probably spent two to three times that on the case. He said the case was a complex wrongful death case involving corporate gross negligence, and that his participation contributed to the child's substantial recovery. He said the trial court and the attorneys wanted him to take an active role in the case. He briefed novel issues to protect the child's interests. He attended twenty depositions and was involved in mediation. He was involved in setting up a guardianship for the child. Dalworth's and Halbert's lawyers negotiated with him directly and discussed settlement. Terry testified he lost other employment because of the time taken by his ad litem duties, and that his skill and experience contributed to the child's recovery. He and Turner testified there was no formal fee arrangement but that the fee was to be at least in part a contingency.

■ Terry testified that his normal hourly rate was $150.00 and that he spent 199 hours on the case. This would justify an ad litem fee of $29,850.00. Although the Bulens argue that the ad litem fee was partly contingent, it is improper to award a percentage of the recovery unless the order appointing the ad litem stated that the ad litem's fees were contingent upon success. *See Brown & Root U.S.A., Inc. v. Trevino*, 802 S.W.2d at 16. The order here mentioned no such condition. Moreover, if the ad litem's fee was partly for his work assisting the case for the plaintiffs, who were representing their clients on a contingent basis, it should have been taken

---

7. The appellants cite *Celanese Chem. Co. v. Burleson*, 821 S.W.2d 257 (Tex.App.—Houston [1st Dist.] 1991, no writ), and *Brown & Root U.S.A., Inc. v. Trevino*, 802 S.W.2d 13 (Tex.App.—El Paso 1990, no writ), to suggest this court should conduct a legal sufficiency and factual sufficiency review of the ad litem fee. This court has said that under an abuse of discretion standard, legal and factual sufficiency are not independent grounds of error but are relevant facts in assessing whether the trial court abused its discretion.

*In re Pecht*, 874 S.W.2d 797, 800 (Tex.App.—Texarkana 1994, no writ). Thus, a court abuses its discretion if the quantum of evidence lies outside the bounds of legal or factual sufficiency, *Rio Grande Valley Gas Co. v. Lopez*, 907 S.W.2d 622 (Tex.App.—Corpus Christi 1995, no writ); *Brown & Root U.S.A., Inc. v. Trevino, supra*, but arguably a court still could abuse its discretion if the quantum of evidence lies within the bounds of legal and factual sufficiency.

from their contingent fee, not charged against Dalworth and Halbert as costs.

Here, the ad litem fee represents an hourly rate of about $500.00 per hour. Terry testified that his normal rate is $150.00 an hour. Although there was testimony that there was to be a contingent element to the fee, the order appointing him attorney ad litem does not mention a contingent fee arrangement, and Terry testified there was no formal fee arrangement with the client or the court.

We find an award of $100,000.00 as the ad litem fee in this case to be an abuse of discretion. Terry submitted to the court a statement listing 199 pretrial and trial hours and 7.4 post-trial hours. He also estimated he would use another twenty hours arranging his client's financial affairs and would use another twenty hours in an appeal, for a total of 246.4 hours. He also estimated he had driven 1,995 miles in connection with the case.

As we find the ad litem fee is excessive and supported by insufficient evidence, we will modify the judgment to award an ad litem fee of $40,000.00.

We modify the judgment to reduce the ad litem fee to $40,000.00. As modified the judgment is affirmed.