Dissenting Opinion by
Justice Moseley
The opinion put forth by the majority is persuasive, knowledgeable, and well-written. However, the entire matter here revolves around employment of the “clear and convincing” evidence standard necessarily employed in a finding of gross negligence. It must be remembered that Texas law requires a finding of “clear and convincing” evidence before a finding of gross negligence can be sustained. Tex. Civ. Prac. <& Rem. Code Ann. § 41.001(11)(A), (B) (West Supp. 2015).
Because the majority has done a masterful job of setting out the facts of the case, a restatement of those facts is unneces *161 sary. The majority opinion also lays out the proven facts upon which they maintain that a jury was justified in ■ finding that there was clear and convincing evidence of the existence of gross negligence. Capsuled, the evidence presented to the jury included that (1) Dennis Rayner apparently regularly falsified his federally-mandated log books, (2) Rayner often failed to submit required driving logs, (3) he had actually filled out a log book ahead of time for the date of the accident, and (4) Ray-ner was the worst offender among all Joe Tex Xpress, Inc. (Joe Tex) drivers of the offense of keeping accurate logbooks. Krista Dillon also proved (1) that Joe Setina, president of Joe Tex, was well aware of Rayner’s shortcomings and (2) that Ray-ner had previously on occasion driven more than the maximum hours prescribed by federal regulation. Joe Tex was also shown to (3) have knowledge that fatigue in drivers presents a danger of collisions in which people are catastrophically injured and (4) that it had stated policies in place regarding the maintenance of log books that, if followed, would have caused Ray-ner to lose his job with Joe Tex (but had chosen to override its own policy and not terminate him). Without a doubt, all of these things were proven by clear and convincing evidence.
However, the clear and convincing proof of those things does not almost inevitably lead to the conclusion that either Rayner or Joe Tex knew that Rayner was fatigued at the time of the collision with Dillon. In order to make that finding, the jury had to leap from the proven facts to conclude that Rayner was known to be fatigued and that he or Joe Tex were aware of that condition. No one (for instance, neither Dillon nor the investigating police officers) testified that Rayner appeared at that time to be fatigued, and Rayner testified that he was not tired.
In a concurring opinion, Justice Harriett O’Neill correctly noted the task of an appellate court when reviewing a case requiring this heightened standard of proof.
When the burden of proof is heightened beyond a mere preponderance of the evidence—for example, when a fact must be proved either by clear and convincing evidence or beyond a reasonable doubt—then the standard for legally sufficient evidence will be correspondingly heightened. When clear and convincing evidence is required, we have held that the party with the burden of proof must introduce enough evidence “that a fact-finder could reasonably form a firm belief or conviction about the truth of the matter.”
Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 631 (Tex.2004) (citations omitted) (quoting In re J.F.C., 96 S.W.3d 256, 266 (Tex.2002) (O’Neill, J., concurring)).
An example of what might be the difference here is illustrated in the realm of libel. In order to protect the First Amendment Constitutional rights, the United States Supreme Court has instituted- a “clear and convincing” burden of proof in cases of defamation. In so doing, the burden is put upon judges, “as expositors of the Constitution, [to] independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of ‘actual malice.’ ” Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Here, the burden is on us, as the reviewers of the record, to distinguish between what was established by clear and convincing evidence and what was not proven to that standard.
Precisely, then, what kind of proof is required to sustain a finding of “clear and convincing?” “[I]n reviewing the legal suf- *162 fieiency of evidence to support a.finding that must be.proved by clear and convincing evidence, an appellate court must ‘look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.’ ” Garza, 164 S.W.3d at 609 (quoting J.F. C., 96 S.W.3d at 266).
Although the evidence is sufficient to prove the first prong of gross negligence (that driving an eighteen-wheeler while fatigued involves an extreme degree of risk of serious harm to other drivers) there must likewise be sufficient evidence that Rayner was actually aware of this risk, and nonetheless chose to drive in a fatigued state. This evidence shows that Rayner quite often drove his eighteen-wheelér in excess of the allowable hours, but there is nothing here to support a “clear and convincing” finding that Rayner was aware of his fatigue on the accident date and that he nonetheless chose to imperil the lives of others by driving while fatigued. The gross negligence finding against Rayner cannot stand.
In its charge to the jury, the trial court defined “negligence” to mean
thé failure to. use ordinary care, that is, failing to do that which a person or company of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances: As to Joe Tex Xpress, Inc., “negligence” may also mean entrusting a vehicle to an unlicensed, incompetent and/or reckless driver if Joe Tex Xpress, Inc.[,] knew or should have known that the driver was unlicensed or incompetent or reckless.
The jury found, by clear and convincing evidence, that the harm to Dillon resulted from gross negligence attributable to Joe Tex.[20] Setina admitted that driving in excess of the maximum hours established by federal regulations results in fatigue, a physical condition which could lead to accidents in which people are catastrophically injured. That is sufficient to establish the objective prong of gross negligence. Stated differently, this evidence establishes that Rayner’s fatigued driving posed an extreme risk or likelihood of serious injury to other drivers, including Dillon. See Tex. Civ. PRAC. & Rem. Code Ann. § 41.001(11)(A).- One must then examine the evidence to detex-mine whether it is sufficient to support- the second prong of gross negligence (i.e., whether Joe Tex knew of an extreme risk of impending harm from allowing Rayner to continue to drive in the face of his repeated over-hours violations, but continued to do so in conscious disregard of the safety of those who might be affected). See Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11)(B).
Setina testified at length about the April 2010 Federal Department of Transpoirtation (DOT) audit, which resulted in a conditional safety rating for Joe Tex,[21] due in part to Rayner’s multiple violations. That rating was in effect at the time of the accident. The audit basically reflected that Joe Tex was “fixing the books” and “falsifying the records,” and it was fined “thousands of dollars” for doing so. Of the forty-eight violations reflected in the audit, thirty-four were critical and, fourteen were nominal. Although Rayner should have been written up by Joe Tex as a result of *163 the critical violations attributed .to him, he was not. Setina acknowledged that when a driver exceeded the .eleven-hour driving time limit, they are unsafe driving an eighteen-wheeler, and he knew Rayner exceed that limit on several. occasions., Per the audit, Rayner was the second-worst perpetrator of log book violations, and although some of the “bad offenders” were terminated after the audit, Rayner was not. Setina knew that Rayner was still not turning in all of his log books, even after Joe Tex advised the DOT that it was implementing a new log book audit system on July 1, 2010. Setina also knew that Rayner often falsified log books prior to the accident.
The Joe Tex log violations program provides for a verbal warning for a first violation, retraining for a second violation within thirty days of the last contact with the driver, and a final warning and counseling on a third violation within thirty days of the last contact with , the driver. A fourth violation within thirty days of the last contact with the driver requires automatic termination. In a form letter sent to drivers who. are found to commit log-book violations, the driver is told whether the warning is a first, second, or third and final warning. When asked if the third and final warning meant termination, Setina testified that as president of the company, “It’s my call. It’s my company. I can kind of do what I want.” Setina further testified that he can decide whether to follow Joe Tex company policy, stating “lean choose to overrule things,” and “I can make the policy as I go, and I can change.it.” Despite Joe Tex’s policy to document disciplinary actions, there is, no documentation that Rayner had ever, been disciplined.
The Joe Tex safety program was designed to ensure that they do not have fatigued drivers. Yet, Joe Tex failed to document that any of its drivers received adequate safety training. One of the company officials testified that evero though the company worked with Rayner regarding his -log book violations after the DOT audit,. she never felt sure that he was filling his log books out correctly. It is important to accurately post logs so that the company can total the hours at the end of each week. If log books are inaccurate, there can never be an accurate recording of how many hours are driven each week. If a driver continually violates company policies in an eighteen-wheeler because they are not filling out their log books correctly, people can be seriously and catastrophically injured. The most important reason to maintain hours within regulations is to prevent driver fatigue.
In -an open letter addressing improvement in their safety rating after the audit, Joe Tex wrote, “We also have made the tough, but necessary decision to lay-off some of our long-time drivers who were responsible for many of the violations and scoring issues we were encountering.” Even though Rayner was responsible for almost nineteen percent of the violations noted on the audit, he was not terminated.
Dalworth Trucking Co. v. Bulen, 924 S.W.2d 728 (Tex.App.—Texarkana 1996, no writ), involved a fact situation similar 'to this case. In that case, this Court addressed the issue of whether the evidence supported a jury verdict that Dalworth was grossly negligent in connection with a fatal accident involving one of its employee drivers. Id. at 731-34. The driver ran a stop sign, killing the occupant of another vehicle. This Court upheld the verdict as supported by the evidence, although Bulen preceded the advent of the clear and convincing standard review of evidentiary sufficiency in gross negligence cases.[22] Id. at 734.
*164 There was proof in Bulen that from July to October 1994, when the accident happened, the driver had committed some fifty-six violations of company speed policies, six violations involving driving in excess of the allowed hours, and one missing log violation.- Id. at 732. Federal regulations restricted driving hours to no more than seventy hours in eight days. Five of the hours violations occurred within the week preceding the accident. Id. The driver failed to log pre-trip and post-trip inspections, and that he was driving more hours than he was logging; this allowed the company to bill the customer for more miles and allowed drivers to be paid for more miles than company time and speed policies allowed. Id. Testimony showed that although company policy provided that a driver would be discharged after accumulating three safety violations, the driver in this case was not terminated, disciplined, or admonished, and the company did not send him cautionary letters concerning his violations. Id. Although Dalworth was aware of many technical safety violations by its driver, none but the excessive driving hours caused or contributed to the wreck. Id. at 733.
The company safety manager testified that company managers were aware of the driver’s over-hours violations, that over-hours driving caused driver fatigue, that fatigue from excessive driving builds up to an almost inevitable loss of alertness in a driver, and that he would give the driver’s overall driving record a grade of “F” so far as safety violations were concerned. The driver had over-hours driving violations on each of the four days preceding the collision. The evidence also showed that repeated safety violations by drivers create an extremely dangerous situation, that company managers knew about the situation but did not suspend, terminate, or admonish the driver, and that to do anything less than that would be inexcusable. The safety manager testified that he knew an accident was almost inevitable if management failed to enforce safety practices vigorously. Id.
As in this case, Bulen was not shown to have exceeded permissible driving hours on the day of the accident. However, on the four days preceding the accident, Bu-len violated the hours regulations for each of those days. Even so, the evidence showed that Bulen was not fatigued on the accident date, that he had a good night’s sleep before the day of on the accident, and that he had several rest breaks on the accident date. Id.
Based on this evidence, this Court concluded that the jury could have reasonably found that the driver’s cumulative safety violations caused a lack of alertness that contributed to his failure to see the stop sign in time to stop and avoid the collision. This Court further concluded that company managers could have reasonably foreseen a similar consequence from their failure to suspend or discipline the driver. Id. at 734.
As in Bulen, the evidence here shows that Rayner committed numerous log violations, including hours violations that tend to cause fatigue. Joe Tex was fully aware of these violations. Despite these similarities, though, two key factors distinguish this case from Bulen. First, this case is subject to a “clear and convincing” evidence standard, whereas Bulen applied the traditional no evidence standard to the gross negligence findings.[23] Id. at 731. So, *165 while the Bulen court merely had to conclude that some evidence of probative force supported the finding in order to uphold it, this Court must determine that a reasonable trier of fact could have formed a firm belief or conviction that its finding was true in order to uphold the gross negligence finding against Joe Tex. Second, there was evidence in Bulen that the driver had driven in excess of the mandated hours on four days preceding the accident, with a total of five hours’ violations within the week preceding the accident. Id. at 732.
Here, Rayner’s log book indicates that two days before the accident, he drove from Dallas to Mobile, but the bill of lading showed that he delivered a load to Sherman on that date. The trip from Dallas to Mobile, as reflected in the log book, shows exactly eleven hours of driving time. Sometime during that same day, Rayner presumably sidetracked to Sherman. There is no testimony indicating how many excess hours Rayner drove on July 21. But on the day before the accident and on the day of the accident, Rayner did not exceed his driving time. The evidence showed that he was well rested on the accident date.
While there was sufficient evidence before the jury to permit it to form a firm belief or conviction that Joe Tex was aware of the extreme risk of serious injury that Rayner’s fatigued driving could cause, I believe that the evidence falls short on the issue of Joe Tex’s knowledge that Rayner posed this type of risk to other drivers on the accident date. Although Joe Tex was aware that Rayner exhibited a pattern of over-hours driving, there is nothing in the evidence to meet the “clear and convincing,” burden that Joe Tex knew that Ray-ner was fatigued on the accident date. While the jury might infer that Joe Tex knew that Rayner was fatigued on the accident date, I do not believe this evidence is sufficient to support that inference under the clear and convincing evidence standard.
I respectfully dissent.

. Both "clear and convincing evidence” and "gross negligence” were appropriately defined.

. A trucking company can be rated as satisfactory, conditional, or unsatisfactoiy by the DOT.

. The verdict against Dalworth wás upheld despite the jury’s finding that the driver was *164 not grossly negligent.

. Under this standard, only the evidence and inferences that, when viewed in their most favorable light, tend to support the finding, are considered. Therefore, if any evidence of probative force supports the finding, the find *165 ing must be upheld. Bulen, 924 S.W.2d at 731.