COURT
OF APPEALS
SECOND
DISTRICT OF TEXAS
FORT WORTH
NO. 2-02-085-CV
 
IN THE INTEREST OF W.E.C.
 
------------
FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY
------------
OPINION
------------
I. Introduction
  
     A jury found that appellant C.E.'s parent-child
relationship with her son, W.E.C., should be terminated, and the trial court
entered judgment on the jury verdict, terminating appellant's parental rights.
In six issues, appellant contends that the evidence is legally and factually
insufficient to support any of the four grounds for termination pleaded by the
Texas Department of Protective and Regulatory Services ("TDPRS") and
is legally and factually insufficient to support the finding that termination is
in W.E.C.'s best interest. She also contends that the trial court erred by
admitting evidence that was privileged under rule 510 of the Texas Rules of
Evidence.  We will affirm.
II. Factual and
Procedural Background
  
     Appellant has three children, M.E., who was born in
October 1990; A.E., born in December 1992; and W.E.C., who was born in February
1999.  W.E.C. had a twin sister, but she died of SIDS in June 1999. 
Appellant is still married to the father of M.E. and A.E., although the couple
separated in 1993; neither appellant nor the children have seen him since then.
Appellant began a relationship with W.E.C.'s father, R.C., in 1997.  Their
relationship continued for about three-and-a-half years.
  
     TDPRS first became involved with appellant and her
children in February 1999 when her twins were born two months prematurely. 
Appellant reported to her doctors that she drank heavily during the first four
months of her pregnancy, but said she quit when she learned she was pregnant. 
However, while the twins were hospitalized after birth, appellant became
intoxicated, fell, lost consciousness, and had to be taken to the emergency
room.  A referral was made to TDPRS while the twins were hospitalized. 
Concerns existed that, because the twins had special medical needs and because
appellant drank heavily, appellant might not be capable of taking care of them
and their special needs.  W.E.C. needed a monitor because he had apnea
episodes where he would quit breathing.  His sister had other problems, and
both children needed measured feeding every three hours around the clock and
required extensive follow-up with specialists in Fort Worth.(1)
  
     Appellant was "extremely cooperative" during
TDPRS's investigation. TDPRS investigators concluded that appellant's two older
boys were functioning relatively well in the home. Following its investigation,
TDPRS implemented an in-home safety plan to help prepare appellant for the
twins' discharge from the hospital and move home. TDPRS worked with appellant,
instructing her not to smoke around the twins, to maintain a clean environment,
and to keep smoke out of the home. They talked to her about her living
conditions and the changes she needed to make in order to bring the twins home
from the hospital. The plan required appellant and R.C. to submit to random
urinalysis and to refrain from using alcohol or drugs while the children were in
their care. Appellant submitted to a urinalysis ("UA"), and it came
back negative. TDPRS determined that, with R.C.'s help and the help of family
members, appellant could care for the twins. The twins were allowed to go home,
to Wichita Falls, with appellant.
  
     The record shows that W.E.C. experienced developmental
delays, with borderline to mild cognitive and speech developmental delays, and a
history of disruptive behavior, such as difficulty complying with demands and
tantrums. W.E.C. functioned at approximately sixty to seventy percent of the
developmental level that he should have demonstrated for his age. He was
diagnosed with static encephalopathy, a brain-based problem that is
nonprogressive, a probable attention-deficit hyperactivity disorder, and
disruptive behavior disorder. W.E.C. was referred and admitted to the North
Texas Rehabilitation Center's Infant/Child Development Program. He needed
continued therapy, medication, support from specialists, and a structured
day-to-day routine. Appellant, however, failed to take W.E.C. to all of his
scheduled appointments with specialists. Appellant does not have a driver's
license or a car and relies on others for transportation. Despite W.E.C.'s need
for continued therapy, appellant eventually discontinued even North Texas
Rehabilitation Center's in-home therapy services.
  
     In April 2000, appellant contacted TDPRS to report that
R.C. had over-medicated W.E.C. in an effort to make him sleep and had kicked A.E.
in the ribs. TDPRS investigated and ruled out a disposition for physical abuse.
The investigation nonetheless showed "extensive risk" to the children,
causing TDPRS to open a case for the provision of in-home safety services. As
part of TDPRS's family preservation plan, both appellant and R.C. were to
abstain from drug or alcohol use. Appellant and R.C. tested positive for
methamphetamine, cocaine, and amphetamine in a random drug screening conducted
on July 17, 2000. All three children were removed from appellant's care.
  
     Appellant claimed that R.C. abused drugs and alcohol,
that he got her involved with drugs, and that she became addicted to
methamphetamine. Appellant explained that she began shooting up methamphetamine,
or speed, in June 1999 about once a month and said her use evolved into a
regular, almost daily, habit after September 1999. She and R.C. also
occasionally used marijuana, and both abused alcohol. Their relationship was
fraught with turmoil, often involving violence.
  
     Appellant's criminal record includes convictions for
theft by check, public intoxication, driving while intoxicated, and driving
while her license was suspended. She served jail time for each of these
offenses. While she was in jail, her stepfather and others cared for her
children. Even after TDPRS removed the children, appellant continued her
relationship with R.C. She claimed at trial, however, that she last saw R.C. in
August 2001, approximately six months before the final termination hearing.
  
     Appellant also claimed at trial that she last used
methamphetamine in August 2001. She admitted that she had a drinking problem and
said she started drinking at around age sixteen. She said she last drank and
became intoxicated in December 2001, the month before the final termination
hearing.
  
     Appellant attended three different treatment programs -
one before TDPRS became involved - but she completed only one of those programs.
After completing the program, appellant failed to continue the weekly outpatient
requirements. Appellant maintained that she has attended narcotic and alcohol
support group meetings on and off for three years, but claims that she sometimes
neglected to provide TDPRS with verification of her attendance at these meetings
as she was required to do under her service plans.
  
     Appellant initially failed to cooperate with TDPRS
concerning visits to her home. She often refused to answer the door when it
appeared she was home, or called TDPRS after a missed appointment and provided
some excuse. She later exhibited a greater willingness to cooperate with regard
to home visits. Although random drug screenings were required by TDPRS under
appellant's service plans, appellant failed to show up for twelve of the
eighteen screenings that were requested. The last drug screening appellant
failed to attend was in August 2001, five months before the final termination
hearing. Out of the six drug screenings appellant did complete, three were
positive for marijuana, cocaine, methamphetamine, and amphetamine.
  
     Pursuant to her service plan, appellant did, however,
maintain a clean home environment, complete parenting classes, and submit to a
chemical evaluation. She also attended some counseling sessions, made all of her
scheduled visits with the children, and attended all permanency planning
meetings.
  
     In September 2001, TDPRS returned M.E. and A.E. to
appellant, but maintained managing conservatorship over the children. W.E.C.,
however, remained in foster care. Subsequently, TDPRS moved to terminate
appellant's parental rights to W.E.C.(2) 
According to TDPRS, the decision to terminate appellant's parental rights to
W.E.C. was based on the services provided to appellant, TDPRS's concerns about
appellant's drug and alcohol abuse, and its belief that appellant was unable to
meet W.E.C.'s special needs or to provide a safe environment for him.
  
     Trial commenced on January 8, 2002 before a jury. After
TDPRS rested its case, appellant moved for a directed verdict, which was denied
by the trial court. Following appellant's presentation of evidence, and the
jury's determination that appellant's parental rights should be terminated, the
trial court entered an order terminating appellant's parental rights to W.E.C.
Appellant filed a motion for new trial and it was overruled by the trial court.
This appeal followed.
III. Burden of
Proof in Termination Proceedings
  
     A parent's rights to "the companionship, care,
custody, and management" of his or her children are constitutional
interests "far more precious than any property right." Santosky v.
Kramer, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); accord
Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). The United States Supreme
Court, in discussing the constitutional stature of parental rights, states,
"[T]he interest of parents in the care, custody, and control of their
children--is perhaps the oldest of the fundamental liberty interests recognized
by this Court." Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct.
2054, 2060 (2000).
  
     In proceedings to terminate the parent-chid
relationship brought under section 161.001 of the family code, TDPRS must
establish one or more of the acts or omissions enumerated under subsection (1)
of the statute and must also prove that termination is in the best interest of
the child. Tex. Fam. Code Ann. § 161.001 (Vernon 2002). Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact. Tex. Dep't of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987). Because of the elevated status of
parental rights, the quantum of proof required in a termination proceeding is
elevated from the preponderance of the evidence to clear and convincing
evidence. Santosky, 455 U.S. at 746, 102 S. Ct. at 1391; see also
Tex. Fam. Code Ann. § 161.001.
  
     Clear and convincing evidence is "the measure or
degree of proof that will produce in the mind of the trier of fact a firm belief
or conviction as to the truth of the allegations sought to be established."
Tex. Fam. Code Ann. § 101.007; In re J.F.C., 96 S.W.3d 256, 264 (Tex.
2002); In re C.H., 89 S.W.3d 17, 25 (Tex. 2002). This intermediate
standard falls between the preponderance standard of ordinary civil proceedings
and the reasonable doubt standard in criminal proceedings. State v.
Addington, 588 S.W.2d 569, 570 (Tex. 1979); In re D.T., 34 S.W.3d
625, 630 (Tex. App.--Fort Worth 2001, pet. denied) (op. on reh'g). While the
proof must be more than merely the greater weight of the credible evidence,
there is no requirement that the evidence be unequivocal or undisputed. Addington,
588 S.W.2d at 570. Termination proceedings should be strictly scrutinized, and
involuntary termination statutes are strictly construed in favor of the parent. Holick,
685 S.W.2d at 20-21; In re A.V., 849 S.W.2d 393, 400 (Tex. App.--Fort
Worth 1993, no writ).
IV. Sufficiency of
the Evidence
  
     In her first four issues, appellant contends that the
trial court erred by denying her motion for directed verdict because TDPRS
failed to prove by clear and convincing evidence any of the four grounds alleged
for termination. TDPRS contends appellant has waived these issues on appeal by
failing to renew her request for a directed verdict after the close of all the
evidence. TDPRS acknowledges, however, that appellant did raise a legal
sufficiency challenge in her motion for new trial.(3) 
We further note that, although not specifically stated in the points raised on
appeal, appellant argues both in her brief and in her motion for new trial that
the evidence was also factually insufficient to support the grounds for
termination. Thus, we conclude that appellant preserved her legal and factual
sufficiency of the evidence challenges. See Tex. R. App. P. 33.1,
38.1(e), 38.9; Sumerlin v. Houston Title Co., 808 S.W.2d 724, 726 (Tex.
App.--Houston [14th Dist.] 1991, writ denied) (op. on reh'g).
A.  Standard of Review
  
     The Texas Supreme Court recently clarified the
appellate standards of review to be applied to legal and factual sufficiency of
the evidence challenges in light of the clear and convincing evidence burden of
proof in termination proceedings. In re J.F.C., 96 S.W.3d at 264-68
(discussing legal sufficiency review); In re C.H., 89 S.W.3d at 25
(discussing factual sufficiency review). Because termination findings must be
based upon clear and convincing evidence, not simply a preponderance of the
evidence, the supreme court has held that the traditional legal and factual
standards of review are inadequate. In re J.F.C., 96 S.W.3d at 265; In
re C.H., 89 S.W.3d at 25. Instead, both legal and factual sufficiency
reviews in termination cases must take into consideration whether the evidence
is such that a fact finder could reasonably form a firm belief or conviction
about the truth of the matter on which the State bears the burden of proof. In
re J.F.C., 96 S.W.3d at 265-66; In re C.H., 89 S.W.3d at 25. With
respect to a legal sufficiency point, we "look at all the evidence in the
light most favorable to the finding to determine whether a reasonable trier of
fact could have formed a firm belief or conviction that its finding was
true." In re J.F.C., 96 S.W.3d at 266. In determining a factual
sufficiency point, we must give due consideration to evidence that the fact
finder could reasonably have found to be clear and convincing and then determine
whether, based on the entire record, a fact finder could reasonably form a firm
conviction or belief that the parent violated one of the provisions of section
161.001 and that the termination of his or her parental rights would be in the
child's best interest. In re C.H., 89 S.W.3d at 25.
B.  Grounds For
Termination
  
     In her first four points, appellant complains that the
evidence is legally and factually insufficient to support the jury's findings
that (1) she knowingly placed or knowingly allowed W.E.C. to remain in
conditions or surroundings that endangered his physical or emotional well-being,
(2) she engaged in conduct or knowingly placed W.E.C. with persons who engaged
in conduct that endangered his physical or emotional well-being, (3) she failed
to comply with the provisions of a court order that specifically established the
actions necessary for her to obtain W.E.C.'s return, and (4) any mental illness
or deficiency on the part of appellant would in all reasonable probability
continue until W.E.C.'s eighteenth birthday, and that all reasonable efforts to
return W.E.C. to the home had been made by TDPRS. See Tex. Fam. Code
Ann. §§ 161.001(1)(D), (E), (O), 161.003(a).
  
     The evidence at trial showed that W.E.C. had
respiratory problems that required daily breathing treatments. Although
instructed by TDPRS to refrain and to have others refrain from smoking around
W.E.C. and to change her clothing after smoking before being around W.E.C.,
appellant continued to smoke in and around the house and allowed others to smoke
in and around the house while W.E.C. lived with her. Appellant also arrived at
visitations smelling of smoke. At the time of trial, the evidence showed that
appellant continued to smoke and allowed others to smoke in her home.
  
     There was also evidence that W.E.C. needed the in-home
therapy services provided by North Texas Rehabilitation Center for his speech
and cognitive delays and that the importance of these services was explained to
appellant. Appellant, however, missed several appointments scheduled for W.E.C.
and eventually discontinued these services altogether, even after being advised
about the detrimental effects this would have upon W.E.C. Dr. Mauk is president
and medical director of the Child Study Center, which diagnoses, treats, and
educates children with developmental disabilities. She testified that
appellant's decision to terminate the services available to W.E.C. through North
Texas Rehabilitation Center was not designed to meet W.E.C.'s needs.
  
     The record further shows that appellant was addicted to
methamphetamines. She claimed that R.C., also a drug and alcohol abuser,
promoted her drug involvement. Although appellant's positive drug screening was
the reason her children were removed from her in July 2000, she nonetheless
continued her drug use and her relationship with R.C. until five months before
trial. Appellant also continued her relationship with R.C. despite the violence
involved in their relationship, her belief that R.C. over-medicated W.E.C. to
try and get him to sleep, her belief that R.C. kicked one of her older sons in
the ribs, and temporary orders following the children's removal requiring that
R.C. be restrained from going within a one block radius of appellant.
  
     Among appellant's other court ordered obligations to
regain custody of W.E.C., she was to refrain from both drug and alcohol use,
complete an in-patient treatment program, submit to appropriate aftercare and
follow-up programs, and submit to random drug screenings. Over the course of the
eighteen months that W.E.C. remained in foster care, appellant completed only
six out of eighteen scheduled screenings. The jury could reasonably infer that
appellant's failure to complete the scheduled screenings indicated she was
avoiding testing because she was using drugs. See In re D.M., 58 S.W.3d
801, 813 (Tex. App.--Fort Worth 2001, no pet.). Additionally, of the six
screenings appellant did complete, she tested positive for methamphetamine and
other drugs on three occasions. Appellant did eventually complete an in-patient
treatment program, and there is evidence she attended narcotics anonymous
meetings off and on. However, she failed to comply with the required follow-up
program to her in-patient treatment and did not report to TDPRS, as required,
about any follow-up treatment.
  
     Appellant also admitted that she is an alcoholic and
that she drank during her pregnancy with W.E.C. W.E.C.'s paternal grandmother
testified that appellant drank through her entire pregnancy, not just during the
first four months. Appellant has a prior arrest for public intoxication and
driving while intoxicated, and she completed a treatment program as part of her
probated sentence. She relapsed, however, and while W.E.C. was hospitalized
following his birth, she drank so much that she fell, lost consciousness, and
was taken to the emergency room. Appellant also admitted she drank "before
August," i.e., during the time W.E.C. was in foster care, and that she
drank to the point of intoxication in December 2001, just one month before
trial.
  
     Appellant testified that at the time of trial she was
not taking the medication prescribed for her depression. She claimed she did not
like the effect it had on her. She was unable to recall the last doctor's
appointment she missed, but said she intended to reschedule.
  
     We have carefully reviewed the entire record. Looking
at all of the evidence in the light most favorable to the jury's finding, we
hold that a reasonable trier of fact could have formed a firm belief or
conviction that appellant engaged in conduct or knowingly placed W.E.C. with
persons who engaged in conduct that endangered his physical or emotional
well-being and that appellant failed to comply with the provisions of a court
order that specifically established the actions necessary for her to obtain
W.E.C.'s return. See In re J.F.C., 96 S.W.3d at 266.
  
     Viewing all of the evidence, giving due consideration
to evidence that the fact finder could reasonably have found to be clear and
convincing, a fact finder could reasonably have formed a firm conviction or
belief that appellant engaged in conduct or knowingly placed W.E.C. with persons
who engaged in conduct that endangered his physical or emotional well-being and
that appellant failed to comply with the provisions of a court order that
specifically established the actions necessary for her to obtain W.E.C.'s
return. See In re C.H., 89 S.W.3d at 25. We overrule
appellant's second and third issues.
  
     When multiple grounds for termination are sought and
the trial court submits the issue using a broad-form question, we must uphold
the jury's findings if any of the grounds for termination support the jury's
finding; only one finding under section 161.001(1) is necessary to support a
judgment of termination. In re D.M., 58 S.W.3d at 813; In re R.C.,
45 S.W.3d 146, 149 (Tex. App.--Fort Worth 2000, no pet.); In re S.F.,
32 S.W.3d 318, 320 (Tex. App.--San Antonio 2000, no pet.); see also Tex.
Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990) (op. on
reh'g). Accordingly, because we conclude there is both legally and factually
sufficient evidence to support the jury's findings under family code section
161.001, subsections E and O, we need not address appellant's remaining points
with respect to the jury's findings under section 161.001, subsection D or
section 161.003(a). See Tex. R. App. P. 47.1.
  
     In order to uphold the jury's decision to terminate
appellant's parental rights, however, legally and factually sufficient evidence
must exist that termination was in W.E.C.'s best interest. See In re D.M.,
58 S.W.3d at 814. We, therefore, turn to appellant's fifth issue on appeal.
C.  Best Interest
  
     Appellant contends TDPRS failed to prove by clear and
convincing evidence that termination of her parental rights was in W.E.C.'s best
interest. We again construe appellant's issue as a challenge to the legal and
factual sufficiency of the evidence.
  
     A strong presumption exists that the best interest of a
child is served by keeping custody in the natural parent. Id. The fact
finder may consider a number of factors in determining the best interest of the
child, including: the desires of the child, the present and future physical and
emotional needs of the child, the present and future emotional and physical
danger to the child, the parental abilities of the person seeking custody,
programs available to assist those persons in promoting the child's best
interest, plans for the child by those individuals or by the agency seeking
custody, the acts or omissions of the parent that may indicate that the existing
parent-child relationship is not appropriate, and any excuse for the acts or
omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.
1976).
  
     "Best interest" does not require proof of any
unique set of factors, nor does it limit proof to any specific factors. Id. Quite
often, the best interest of the child is infused with the statutory offensive
behavior. In re D.M., 58 S.W.3d at 814. While there are instances where
the offending behavior will demand termination of parental rights, there are
also those cases where the best interest determination must have a firm basis in
facts standing apart from the offending behavior. Id. Although such
behavior may reasonably suggest that a child would be better off with a new
family, the best interest standard does not permit termination merely because a
child might be better off living elsewhere. Termination should not be used to
merely reallocate children to better and more prosperous parents. Id. (citing
In re C.H., 25 S.W.3d at 52-53).

 1.  W.E.C.'s
 Desires

  
     W.E.C. was too young at the time of trial to express
his desires. The evidence did show that appellant loved W.E.C. very much, as did
his two older brothers, and that they wanted him to come home.

 2.  Present and
 Future Physical Emotional Needs and Dangers

   
    As for W.E.C.'s present and future physical and emotional
needs and the present and future physical and emotional dangers to him, evidence
showed that appellant drank regularly during her pregnancy with W.E.C., although
she testified that she only did so for the first four months and that she did
not know she was pregnant. There was no definitive evidence, however, that any
of W.E.C.'s problems at birth or his developmental delays were due to
appellant's alcohol consumption during her pregnancy.
  
     Evidence also showed appellant did not fully appreciate
or understand the extent of W.E.C.'s needs following his birth. Christina Burt
conducted an investigation of appellant's family based upon the referral made by
the hospital following W.E.C.'s birth but before the children's removal. Burt
testified that although W.E.C. and his sister were two weeks old when she became
involved in their case, appellant had made very little preparation for the
twins' arrival. Burt testified that appellant had not assembled a crib for the
babies. Burt expressed concern that appellant seemed unfamiliar with some of the
twins' medical issues and medical equipment, like W.E.C.'s apnea monitor. She
testified that appellant had not been proactive in finding out what resources
were available in the community to help her take care of the twins.
  
     Carol Noel, a physical therapist for North Texas
Rehabilitation Center, performed an evaluation on W.E.C. when he was four months
old. She determined that W.E.C. was developmentally delayed by about two months
and had abnormal muscle tone. She recommended that W.E.C. have weekly physical
and speech therapy. Although appellant initially seemed interested in W.E.C.'s
therapy and was eager to show therapists what W.E.C. could do, she cancelled
thirteen of twenty-five appointments. Noel could not complete her service plan
with W.E.C. because of his absenteeism. Appellant eventually refused further
services for W.E.C., even though she was told discontinuation of therapy would
be very detrimental to W.E.C. Overall, W.E.C. fell further behind during the six
months Noel worked with him, demonstrating a two to four month developmental
delay when appellant discontinued services. Noel could not say whether W.E.C.'s
delays were the result of his sporadic therapy visits or were due to his
neurological system's inability to progress, despite therapy.
  
     Evidence showed that W.E.C. resumed weekly therapy
sessions when he was placed in foster care, and at that time, he was about two
to four months delayed in his motor skills, cognitive abilities, and speech,
when adjusted for his prematurity. He did not display any aggressive behavior
when initially placed in foster care, but developed behavioral problems, or
"aggressive outbursts," while in foster care, which were believed to
be due to his cognitive delays and frustration over inability to process
information and grasp concepts. At the time of trial, W.E.C. had about a seven
month delay in his cognitive abilities, was age-appropriate in his motor skills,
and had an approximate four to six month speech delay. Dr. Mauk described
W.E.C.'s developmental delays as "borderline to mild," meaning that he
was functioning somewhere between sixty to seventy percent of the developmental
level for his age. W.E.C. was expected to be transferred to the public school
system when he reached three years of age for placement in an early childhood
education program designed to mainstream him into regular classes in school.
  
     W.E.C. was described as a "special needs"
child, who will need more supervision and care than a normal child and who will
benefit from a lot of one-on-one time. He responds to consistency and time-out.
He will need additional resources for support in school, he will have to work
hard, and he will need a "proactive" caregiver who is very supportive
of him and able to work with his school. The failure to meet his needs could
result in significant harm to him, cause him not to develop to his potential,
and cause other problems, such as behavior issues.

 3.  Parental Abilities

  
     TDPRS caseworkers and therapists testified that
appellant was unable to care for W.E.C. and meet his needs in the past and would
be unable to meet W.E.C.'s needs in the future. Dr. Sabine, who performed a
psychological evaluation on appellant, had serious reservations over appellant's
ability to parent W.E.C. effectively. He testified that appellant's low
intellectual level, impaired empathy, poor judgment, and relationship with R.C.
all created risks regarding her ability to parent a special needs child like
W.E.C. He testified that appellant's drug and alcohol abuse interfered with her
ability to manage her life. Dr. Sabine also expressed concern about appellant's
unstable financial situation and unstable relationships, including her new
relationship with another recovering methamphetamine addict. He diagnosed
appellant with dependent personality disorder, which is a long-term disorder,
characterized by a desperate need to get one's needs met at the expense of other
things. This disorder, especially when combined with a chemical dependency
problem, makes it difficult for appellant to recognize and meet the needs of her
children. He described appellant's parenting abilities as "reactive,"
as opposed to "proactive." Based on testing, a review of appellant's
MHMR records, and the fact that appellant's two older children also possessed
special needs, Dr. Sabine expressed "grave" or "strong
reservations" about appellant's ability to successfully or safely meet
W.E.C.'s special needs. Dr. Sabine admitted he had not evaluated W.E.C.; if he
had been given the opportunity to do so it would have "add[ed] a lot to
[his] confidence."
  
     Melynn Conway, the TDPRS supervisor over W.E.C.'s case,
testified that she did not believe appellant could meet W.E.C.'s needs now or in
the future. Conway thought appellant could endanger W.E.C. either by the things
she didn't do or by the people she allowed in their home. Conway said she does
not believe appellant understands W.E.C.'s needs. She expressed concern that
appellant does not have an adequate support system of extended family and
friends. According to Conway, appellant's past behavior, her continued use of
drugs and alcohol, her missed drug screenings, her failure to comply with
aftercare drug treatment, and her violent relationships all demonstrate that
W.E.C. is at risk for harm. Conway believed that termination was in W.E.C.'s
best interest based on his age, vulnerability, and inability to protect himself.
  
     Although the jury heard evidence of appellant's
inability to meet W.E.C.'s needs, evidence was presented showing that appellant
was able to care for W.E.C. Testimony established that appellant was able to
understand and administer W.E.C.'s breathing treatments. Appellant has the
ability to understand the specific things necessary to care for W.E.C.'s special
needs and to apply them in her daily life, if appropriately motivated. Noel, one
of the therapists that initially worked with W.E.C., testified that she believed
appellant was "capable" of providing or helping W.E.C. with the
necessary services; appellant did not appear mentally slow and spoke openly with
her about W.E.C.'s progress. While Dr. Sabine expressed his
"reservations" about appellant's ability to care for a special needs
child, he also stated that it was not impossible for her to do so. He said there
was no way to know whether appellant could care for W.E.C.'s special needs if
she was not given the opportunity to do so. Additionally, while alcohol and
drugs interfered with appellant's ability to manage her life, at the time of
trial, she had not refused any drug screenings since August 2001 and had not
tested positive for any drugs during that time.
  
     The record reflects that, prior to TDPRS's removal of
her children, it was appellant who contacted TDPRS for help because of her
belief that R.C. had abused her children. Appellant's counselor, Wendy McGuire,
testified that TDPRS refers clients to her and that very few people initiate
contact with TDPRS to obtain assistance in parenting their children. Conway
acknowledged that appellant's contacting TDPRS as a resource was appropriate at
the time. Appellant told McGuire that she wanted what was best for her children
and admitted that she needed assistance "to get her life together."
  
     McGuire identified appellant's main strengths as her
love for her children and that she wanted what was best for her children. She
described appellant's weaknesses as (1) tending to put responsibility on others
and minimizing her role in incidents, which she noted is consistent with
dependent personality disorder; (2) poor communication; and (3) appellant's
history of drug and alcohol abuse. She found appellant's insight into the harm
and consequences that this caused her children was "service level."
Over the course of therapy, appellant developed additional strengths, such as
the ability to communicate some of the things she regretted, expressing her
thoughts and feelings more, acknowledging her poor choices, engaging in better
communication with others, and becoming more compliant with TDPRS. McGuire also
believed appellant was motivated to obtain employment to better meet her
children's needs. McGuire testified that appellant has made progress in therapy.
She has increased self-esteem, more effective communication skills, increased
knowledge of parenting skills, and is accepting responsibility for her primary
role as parent.
  
     McGuire believed appellant could provide for W.E.C.'s
basic needs. Indeed, there was no evidence that appellant was unable to meet her
children's nutritional, clothing, or shelter needs. Appellant also expressed
motivation to provide for W.E.C.'s special needs. Yet, while McGuire felt
appellant was capable of performing the tasks necessary to meet those needs,
because of appellant's past inconsistency, she could not predict whether
appellant would actually follow through and consistently meet W.E.C.'s needs.
McGuire noted that appellant has a limited support system and that her
"concrete thinking" placed her on "the low end" of being
able to take advantage of available resources. McGuire said, however, that if
appellant had more knowledge of the available resources and had adequate
transportation, she would be better able to take advantage of these resources.
  
     In June 2001, after rejecting prior attempts by TDPRS
to refer her for services, appellant went to MHMR on self-referral to be
assessed for services. Appellant's skills training and services coordinator,
Natasha Thomas, testified that, in the three to four months that she worked with
appellant, appellant appeared responsive to working on problems, became more
participatory as sessions progressed, and made progress in her treatment goals.
Appellant seemed able to understand instructions and the things they discussed,
and she appeared motivated to follow through with the plans they discussed.
Thomas acknowledged, however, that appellant failed to attend four of her
scheduled appointments, that she was not honest about her sobriety, and that her
last contact with appellant was in November 2001. During this time, appellant
was also diagnosed with bipolar disorder, but she had not been keeping her
doctor's appointments for treatment of this illness. Given appellant's past
history, Thomas expressed a "guarded prognosis" as to whether
appellant will remain engaged in services.
  
     In addition to W.E.C.'s special needs, there was
evidence that both M.E. and A.E. have dyslexia, that A.E. also has ADHD and an
anger problem, and that they both receive special education at school for these
problems. Burt testified that both children were functioning relatively well in
appellant's home when she conducted her investigation in 1999. They were
involved in football and baseball and were described by Deena Hundley, whose
boys played with appellant's boys, as "well[-]mannered," "good
kids," who seemed taken care of. Hundley testified that M.E. and A.E.
played at her house and that she has not had any reservations about her boys
playing at their house. She observed appellant around both M.E. and A.E., as
well as W.E.C. after he was born, and appellant was always good with them and
provided a loving, stable environment. Hundley never noticed anything unusual
about W.E.C. or anything to indicate W.E.C. wasn't being taken care of;
appellant seemed to love him and gave him his breathing treatments. Hundley
testified that she believes appellant can care for W.E.C. and that she is a
motivated parent. Hundley admitted that she did not know appellant had refused
in-home services for W.E.C. She also admitted that she did not spend that much
time with appellant and that she did not know appellant had a drug problem.
  
     When M.E. and A.E. were returned home to appellant, she
was "elated" and "overwhelmed with joy" to be a mother again
and to provide them with care, love, and nurturing. Since M.E. and A.E. have
returned home, appellant has recognized their need to maintain the structured
environment they experienced in foster care and expressed a strong desire to
maintain this structure. She is also more aware of her home environment and of
safety issues and is "proactive" in eliminating inappropriate items
from her home. Since M.E. and A.E. returned home, appellant has requested help
from TDPRS. TDPRS is providing appellant with therapy for M.E. and A.E., but
they had only been to one appointment since coming home and were attending
another on the day of trial.
  
     Appellant testified that M.E. and A.E. were making Bs
and Cs in school before they went to foster care, while their foster mother
testified the boys were failing several classes when she got them. Both stated
that their grades improved while in foster care, and appellant admitted M.E.'s
and A.E.'s grades had fallen since coming back home.
  
     A teacher for each of the boys also testified. Kari
O'Brien, M.E.'s teacher for dyslexia, reading intervention, and tutorials,
testified that M.E. has mild dyslexia. She said M.E. is usually well-groomed and
properly dressed. She has never set up a conference with appellant.
  
     A.E.'s teacher, Jackie Wheat, also testified. She
stated that A.E. first came to school in September 2001. A.E. was neatly
dressed, ready for school, and prepared. As time passed, A.E. stopped turning in
work, his grades started to fall, and he sometimes came to school "not very
clean." His appearance and hygiene, however, have improved. Wheat stated
that A.E.'s home reports came back with appellant's signature. Appellant
attended A.E.'s open house at school, but Thomas was with another parent and
didn't speak with appellant. Although appellant twice indicated to Thomas that
she would conference with Thomas regarding A.E., appellant never followed
through in setting any parent-teacher conferences. Thomas said she did not know
A.E. had ADHD until informed by TDPRS.

 4.  Available Programs

  
     Evidence was presented regarding several programs
available to assist appellant and help W.E.C. with his special needs if
appellant would take the initiative to avail herself of these programs. Conway
testified that, in her opinion, appellant did not have the ability to motivate
herself to seek out available resources needed by W.E.C. now or in the future.

 5.  Acts or Omissions

  
     As for appellant's acts or omissions, the evidence
established that appellant has a drug and alcohol problem. Appellant initially
told her chemical assessment counselor that she wasn't bothered by her drinking
and was more concerned with her drug use. However, appellant said she did not
feel her drug use had any affect on her relationship with her children, except
that it made her more attentive. Appellant later testified about her alcohol and
drug addictions and admitted that her behavior was not showing that she was
taking care of her children. Nonetheless, appellant continued to use
methamphetamines within five months of the final termination hearing, and she
drank to the point of intoxication only a month before the final hearing.
  
     When appellant did have custody of W.E.C., she failed
to make all of his scheduled appointments with his specialists and eventually
discontinued his in-home therapy with North Texas Rehabilitation Center.
Appellant cited problems with the therapists showing up on occasion and her
difficulties in arranging the appointments as her reasons for discontinuing the
in-home services. The therapists, however, testified that appellant had standing
appointments and that she did not provide any specific reasons for discontinuing
services.
       
Once W.E.C. was placed in foster care, appellant was not involved in his therapy
sessions. There was evidence, however, that no one sent her notice or requested
that she be involved with W.E.C.'s therapy. It was noted that if appellant had
been included and asked to attend W.E.C.'s therapy sessions, it may have helped
her gain an understanding of W.E.C.'s medical and developmental issues.
  
     There was testimony that appellant appeared motivated
to get her children back. McGuire described her participation in counseling as
above average for a TDPRS client; she saw appellant thirty-six times, and
appellant cancelled six appointments and failed to appear at eleven other
appointments. Appellant made all visitations with her children while they were
in foster care and her interaction with the older children was described as
"appropriate;" appellant "hugged them, gave them gifts, sat down
with them, [and] asked [them] questions." Appellant also attended all
permanency planning team meetings and participated in the discussions at those
meetings.
  
     Appellant admitted that she hasn't "done the right
things in the past" and that she turned to alcohol and drugs to help her
cope following her daughter's death and her mother's death. She admitted that
her past behavior did not constitute "taking care" of her children.
Appellant also admitted that her recent drinking relapse occurred because of
stress, that she had used both alcohol and drugs in the past to cope with her
stress, and that having all three children in her home will be stressful.
Appellant explained, however, that she wants a second chance with W.E.C. and a
second chance to show everyone she can take care of him. She has learned through
her parenting classes that her children should come first. Appellant testified
that she understands the concerns expressed regarding her new boyfriend. She
said she would be willing to terminate her new relationship if required by TDPRS
and if necessary to keep her children.
  
     Appellant said she also realized, after sitting through
trial, that W.E.C. has a lot more problems than she first thought. She also
testified, however, that she does not believe W.E.C.'s problems are as dire as
portrayed by the witnesses at trial and that she loves W.E.C. and is willing to
do anything to help him.

 6.  Plans for W.E.C.

  
     TDPRS's plan for W.E.C. was to terminate appellant's
parental rights and place him for adoption. A family who knew W.E.C. from their
church's mother's day out program and who took care of him when his foster
family was out of town wanted to adopt him.

 7. 
 Other Factors

  
     Additional evidence showed that while appellant severed
her relationship with R.C. in August 2001, she immediately met and began another
relationship with Tim Thompson, a man who lives with his sister behind
appellant's house. He is also a recovering methamphetamine addict, and they
attend NA meetings together. He considers the December drinking a relapse for
both of them, but claims they talked about the situation and how to avoid
another incident. Both he and appellant acknowledge that NA recommends that no
one engage in a relationship during the first year of treatment or with someone
in the same or similar circumstances. They admit they are not following this
recommendation. They have discussed moving in together, but have not made a
decision. He spends the night at appellant's house two to three times per week
while M.E. and A.E. are there, but he admits this situation is not a good
example for the boys.
  
     McGuire stated that appellant's new relationship caused
her concern. NA advises that individuals not have a relationship within their
first year of sobriety because it contributes to the possibility of a relapse.
She said appellant's new relationship seems to be following a pattern similar to
the pattern appellant demonstrated in her relationship with R.C. McGuire said
appellant still has an unhealthy, although new, relationship and has found a new
codependent. McGuire said this pattern is consistent with dependent personality
disorder. She recalled that appellant admitted putting R.C.'s needs over those
of her children. According to McGuire, a real risk exists that appellant will do
the same with her new boyfriend. Also, appellant had similar struggles between
her family members and her children, and she chose her brothers over the best
interests of her children by allowing her brothers to use drugs and alcohol in
her home when the boys were present.
  
     In connection with her argument that TDPRS failed to
prove by clear and convincing evidence that termination of her rights was in
W.E.C.'s best interest, appellant points out that TDPRS obviously believed her
parenting skills had improved because the two older boys were returned to her.
She contends that TDPRS's return of the two older boys to her when she had been
clean for only a month is inconsistent with its refusal to return W.E.C. to her
at the time of trial after she had been clean for over four months, as
documented by an increased number of random drug screenings. Under the facts
presented to the jury in this case, we cannot agree with appellant's contention.
  
     Patricia Barber, a Volunteer Coordinator with Child
Advocates, was appointed by the trial court to conduct an independent
investigation and to make a recommendation as to what is best for the children.
Barber testified that she didn't "necessarily have a problem with the kids
that are there." She explained that M.E. and A.E. "are older children
and capable, I suppose, of calling if they were in need of some sort of help
immediately." Likewise, Conway, the TDPRS supervisor over W.E.C.'s case,
testified that a greater risk of harm existed as to W.E.C. because of his age
and his special needs. The jury was free to accept this testimony. They could
also have accepted Dr. Sabine's testimony that placement of a third, special
needs child, like W.E.C., in appellant's home would present an increased risk to
all three children. See Moreland v. State, 531 S.W.2d 229, 235 (Tex.
Civ. App.--Houston [1st Dist.] 1975, no writ) (concluding findings
that surroundings endangered the well-being of two children, but not other
children, were not inconsistent where evidence existed supporting the findings).
  
     The jury had the opportunity to view the demeanor of
the witnesses throughout trial, to weigh the testimony, and to examine
appellant's past behavior as a means of predicting her future conduct. Indeed,
appellant has made recent improvements in her life and it is undisputed that she
loves her children. There was also evidence, however, indicating appellant's
problems continued up until and through trial: appellant had a new relationship
with a recovering addict, the month before the final termination hearing she
drank to the point of intoxication, and she missed doctor and therapy
appointments for both the boys and for herself.
  
     Looking at all of the evidence in the light most
favorable to the fact finder's finding that the termination of appellant's
parental rights to W.E.C. was in his best interest, we hold that a reasonable
trier of fact could have formed a firm belief or conviction that termination was
in W.E.C.'s best interest. See In re J.F.C., 96 S.W.3d at 266. Giving
due consideration to evidence that the fact finder could reasonably have found
to be clear and convincing, and based on our review of the entire record, we
hold that a fact finder could reasonably form a firm conviction or belief that
the termination of appellant's parental rights would be in W.E.C.'s best
interest. See In re C.H., 89 S.W.3d at 25. Accordingly, we hold that
the evidence is both legally and factually sufficient to support the jury's best
interest finding. We overrule appellant's fifth issue.
V.
Admissibility of Evidence
  
     In her sixth and final issue, appellant contends that
the trial court erred by admitting evidence that was privileged under rule 510
of the Texas Rules of Evidence. Tex. R. Evid. 510. Specifically, appellant
complains that the trial court admitted her privileged communications to her
drug treatment counselor, Steve Rueschenberg.
  
     Rule 510 provides that "[c]ommunication between a
patient and a professional is confidential and shall not be disclosure in civil
cases." Id. TDPRS contends that appellant waived the privilege
because she voluntarily disclosed the same information to TDPRS and others. See
Tex. R. Evid. 511(1) (providing that privilege is waived if person holding
privilege voluntarily discloses or consents to disclosure of any significant
part of privileged matter unless such disclosure itself is privileged).
  
     Rueschenberg performed a chemical dependency assessment
on appellant on July 31, 2000. He testified about the information appellant
disclosed to him regarding her drug and alcohol abuse; her problems with
depression, anxiety, and tension; and her abusive relationships. He concluded
that statistically a high probability existed that appellant would struggle with
chemical dependence, and he recommended long-term treatment. Appellant also
disclosed the majority of this information to her caseworkers, therapists, and
friends, who all testified at trial. Additionally, appellant herself testified
that she abused both drugs and alcohol, that she turned to these substances when
she was depressed, and that she had abusive relationships with the children's
fathers. Appellant and others also testified concerning appellant's efforts to
obtain and remain in treatment for her addictions. We hold that appellant waived
her privilege with regard to her communications to Rueschenberg. See Berger
v. Lang, 976 S.W.2d 833, 837 (Tex. App.--Houston [1st Dist.]
1998, pet. denied) (concluding that disclosure of significant part of
information in State Bar of Texas grievance letter resulted in waiver of
confidentiality).
  
     Additionally, because the record contains testimony
from appellant and other witnesses that is the same or similar to Rueschenberg's
testimony, the record reflects no harm in the admission of his testimony. In
determining whether any error in the admission or exclusion of evidence
constitutes reversible error, the complained-of error must probably have caused
the rendition of an improper judgment. Tex. R. App. P. 44.1(1). The party
alleging that the admission of evidence resulted in an improper judgment does
not have to show that "but for" its admission, there would have been a
different result. McCraw v. Maris, 828 S.W.2d 756, 758 (Tex. 1992).
Rather, they must show only that the admission resulted in an improper judgment.
Id. "A successful challenge to evidentiary rulings usually
requires the complaining party to show that the judgment turns on the particular
evidence excluded or admitted." City of Brownsville v. Alvarado,
897 S.W.2d 750, 753-54 (Tex. 1995). Because other evidence in the record
establishes the same facts testified to by Rueschenberg, appellant cannot
establish that any error in admitting his testimony constitutes reversible
error. See Dalworth Trucking Co. v. Bulen, 924 S.W.2d 728, 736 (Tex.
App.--Texarkana 1996, no writ). We overrule appellant's sixth issue.
VI. Conclusion
  
     Having overruled appellant's second, third, fifth, and
sixth issues on appeal, we affirm the trial court's judgment.
 
                                                       
   SUE WALKER
                                                       
   JUSTICE
 
PANEL B: HOLMAN, GARDNER, and
WALKER, JJ.
DELIVERED: June 5, 2003

1. Appellant resides in Wichita Falls.
2. R.C. voluntarily relinquished his parental rights to
W.E.C. and is not a party to this appeal.
3. A legal sufficiency challenge asserted in a motion for
new trial preserves the issue, but only entitles appellant to a new trial. See
Horrocks v. Tex. Dep't of Transp., 852 S.W. 2d 498, 499 (Tex. 1993); In
re G.C., 66 S.W.3d 517, 527 (Tex. App.--Fort Worth 2002, no pet.).