OPINION
Opinion by
Chief Justice Morriss
After years of frequent errors and gaps in his required driving logs and after days and weeks of a taxing driving schedule, the extent of which is subject to some question—-in large measure because of the unreliable driving logs—long-haul truck driver Dennis Rayner was driving his tractor-trailér 'rig east on Interstate Highway 30 through Sulphur Springs when he hit Krista Dillon’s automobile from the left rear as he changed from the center lane to the right lane. After initially refusing medical care at the accident scene, Dillon went to a local emergency room that evening, complaining of head, neck, and low-back pain. Eventually, Dillon underwent an anterior cervical discectomy and fusion at C3-4 and a posterolateral fusion and foraminotomy on L2-3 for traumatic facet disruption and nerve root compression. As a result, Dillon "sued Rayner and his employer, Joe Tex Xpress, Inc. (Joe Tex), for personal injury and was awarded judgment for actual damages in excess of $1 million[1] and exemplary damages in the amounts of $2,000.00 against Rayner and $1,679,259.52 against Joe Tex.[2]
This appeal centers on the jury' findings of gross negligence. Rayner and Joe Tex argue that the evidence is legally and factually insufficient to support the gross-negligence findings. Because we disagree, we affirm the judgment of the trial court.
1. The Evidence
Rayner was hired by Joe Tex in 2007 as a long-haul truck driver, but at the time of the July 23, 2010, accident, he had over thirty years of long-haul experience. On the day of the accident, evidence suggests that Rayner left Van, Texas, at approximately 9:30 a.m. and drove to Wylie, where he unloaded his truck. After he unloaded in Wylie, Rayner drove to Dallas, where he was scheduled to pick up another load that was ultimately cancelled. Rayner was driving from Dallas to Joe Tex’s headquarters in Mount Vernon when the accident occurred. As he was traveling east on Interstate 30 through Sulphur Springs[3] at approximately 1:30 p.m., Rayner changed lanes from the right-hand, or outside, lane to the left-hand, or inside, lane to pass a car that was in the outside lane. As he was returning to the outside lane, the front passenger portion of Rayner’s truck struck the rear driver’s side of Dillon’s Chevy Malibu, causing her car to spin into the median between the service road and the interstate. Rayner stated that Dillon’s car was in his “blind spot” and that he simply *147 did not see it. Rayner received a citation for changing lanes when it was unsafe to do so.
Dillon’s evidence of gross negligence included (1) proof of repeated incidents of log book falsification by Rayner, (2) a Federal Department of Transportation (DOT) audit in April 2010 that reflected: forty-eight safety-related -violations by Joe Tex drivers, thirty-four of which were critical, and which resulted .in the lowering of Joe Tex’s safety rating from “satisfactory” to “conditional” status, (3) proof that Joe Tex’s safety rating at the time of .the accident was “conditional,” (4) proof that, in the month before the accident, Rayner failed to submit thirteen driving logs required by the DOT and that this constituted thirteen violations, (5) proof that Ray-ner falsified his log books in the month and days preceding the accident, (6) proof that Rayner committed log'-book violations on the date of the accident, (7) Rayner’s admissions that he “sucked” at maintaining driving logs and that he has been “sloppy” with his log books for years, (8) proof that the federal regulations establishing maximum daily and weekly hours of service for long-distance drivers are designed to keep fatigued drivers from operating vehicles,[4] (9) proof that fatigue plays a role in most tractor-trailer, or eighteen-wheeler, accidents, and (10) the admissions by Joe Seti-na, the president of Joe Tex, that (a) Joe Tex was fined by the DOT for producing falsified log books, (b) Rayner was the second worst perpetrator of log book violations among the Joe Tex drivers, (c) he knew before the accident that Rayner falsified his log books, (d) Rayner and Joe Tex make money when Rayner drives his truck and then falsifies his log book to indicate that he was off duty when he was driving, (e) driving in excess of the maximum hours established by federal regulations results in fatigue, which could lead to accidents in which people are catastrophically injured, (f) the policies and procedures of Joe Tex state that a driver’s employment will be terminated on commission of a fourth log book violation within thirty days of the last violation, and (g) while Rayner had committed more than four log book violations, his employment was not terminated because, according to Setina, “It’s my call. It’s my company. I can kind of do what I want.”
II. The Law
Rayner and Joe Tex contend that the evidence is legally and factually insufficient to support the jury’s findings of gross negligence as to each of them. “Gross negligence” is statutorily defined as an act or omission:
(A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the .potential harm to others; and
(B)-of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.
Tex. Civ. Prao. & Rem. Code Ann. § 41.001(11)(A), (B) (West Supp. 2015). Under the first, objective element, an “extreme risk” is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. Mobil Oil Corp. v. Ellender, 968 S.W.2d 917, 921 (Tex.1998).
*148 Under the subjective element, “actual awareness means that the defendant knew about the peril, but its acts or omissions demonstrated that it did not care.” Id. “[AJwareness of an extreme risk does not require proof that the defendant anticipated the precise manner in which the injury would occur to identify to whom the injury would befall.” U-Haul Int’l, Inc. v. Waldrip, 380 S.W.3d 118, 139 (Tex.2012). Determining whether an act or omission involves peril requires “an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight.” Transp. Ins. Co. v. Monel, 879 S.W.2d 10, 23 (Tex.1994), superseded by statute, Act of Jun. 2, 2003, 78th Leg., R.S., ch. 204, § 13.02, 2003 Tex. Gen. Laws 847, 887, as recognized in Wal-drip, 380 S.W.3d at 140. Both elements of gross negligence must be proven by clear and convincing evidence, Waldrip, 380 S.W.3d at 138, and may be proven by circumstantial evidence. Boerjan v. Rodriguez, 436 S.W.3d 307, 311 (Tex.2014) (per curiam).
In reviewing the legal sufficiency of the evidence supporting a finding that must be proven by clear and convincing evidence, we must consider “all the evidence in the light most favorable to the finding to.determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.” Diamond Shamrock Ref. Co. v. Hall, 168 S.W.3d 164, 170 (Tex.2005) (quoting Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 627 (Tex.2004)); see Tex. Civ. PRAC. & Rem. Code Ann. § 41.001(2) (West Supp. 2015). “To give appropriate deference to the fact[-]finder’s conclusions and the role of a court conducting a legal sufficiency review,” we “must assume that the fact[-]finder resolved disputed facts in favor of its finding if a reasonable fact[-]finder could do so.” Garza, 164 S.W.3d at 627 (quoting In re J.F.C., 96 S.W.3d 256, 266 (Tex.2002)). Conversely, we must “disregard all evidence that a reasonable fact[-]finder could have disbelieved or found to have been incredible.” /(¿. .(quoting J.F.C., 96 S.W.3d at 266). We must be careful, however, not to disregard undisputed facts that do not support the finding, as this “could skew the analysis of whether there is clear and convincing evidence.” Id. (quoting J.F.C., 96 S.W.3d at 266). Should we conclude that no reasonable fact-finder could form a firm belief or conviction that both the objective and subjective elements of gross negligence were proven with respect to Rayner and Joe Tex, then we must conclude that the evidence is legally insufficient.
“The distinction between legal and factual sufficiency when the burden of proof is clear and convincing evidence may be a fine one in some cases, but there is a distinction in how the evidence is reviewed.” In re J.F.C., 96 S.W.3d 256, 266 (Tex.2002). In a factual sufficiency review, our inquiry is “whether the evidence is such that a fact[-]finder could. reasonably form a firm belief or conviction about the truth of the ... allegations.” Id. (quoting In re C.H., 89 S.W.3d 17, 25 (Tex.2002)). We consider “whether disputed evidence is such that a reasonable fact[-]finder could not have resolved that disputed evidence in favor of its finding.” Id. Evidence is factually insufficient “[i]f, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction.” Id.
III. Causation Is Established
The parties devote significant argument to the issue of whether Rayner’s fatigue caused the accident. The sole basis of this appeal, however, involves the ques *149 tions of whether the evidence is legally and factually sufficient to support the jury’s findings that it was the gross negligence of Rayner and Joe Tex that resulted in Dillon’s harm. To resolve these issues, we need to determine only whether there is clear and convincing evidence of both the objective and subjective components of gross negligence as defined by statute. See Tex. Civ. PRAc. & Rem. Code ANN. § 41.001(11)(A), (B). In order to conduct this analysis, we need not perform a sufficiency review of the evidence regarding the proximate cause of the accident. In fact, we are not even authorized, on this record, to review the sufficiency of the proximate cause evidence in this case.
The logic of this position follows. As a prerequisite to any gross negligence findings, Dillon was required to prove the basic elements of a cause of action for ordinary negligence, i.e., that' Rayner and Joe Tex’s breach of the ordinary standard of care proximately caused her damages. See Nowzaradan v. Ryans, 347 S.W.3d 734, 741 (Tex.App.—Houston [14th Dist.] 2011, no pet.); Sonic Sys, Int’l, Inc. v. Croix, 278 S.W.3d 377, 394-95 (Tex.App.— Houston [14th Dist.] 2008, pet. denied) (finding of ordinary negligence prerequisite to finding of gross negligence). Once the jury found that Rayner and Joe Tex were negligent, i.e., that they breached the ordinary standard of care and that such breach proximately caused damage to Dillon, the causation element was satisfied, and the jury was not required to make a new finding of causation connecting Ray-ner’s and Joe Tex’s gross negligence to Dillon’s harm. See Fort Worth Hotel, Ltd. P’ship v. Enserch Corp., 977 S.W.2d 746, 753 (Tex.App.—Fort Worth 1998, no pet.) (because jury was instructed that defendant was negligent and that negligence was proximate cause of damages, jury was not required to make new causation finding in order to determine defendant’s gross negligence). Stated differently, once the jury determined that Rayner’s and Joe Tex’s ordinary negligence proximately caused damage to Dillon, the only question that remained for the jury to answer was whether' that negligence was not just ordinary negligence, but was, instead, gross negligence.
This issue was addressed most recently in Telesis/Parkwood Retirement I, Ltd. v. Anderson, 462 S.W.3d 212, 247 (Tex.App.—El Paso 2015, no pet.). There, the appellees complained that “there was no clear and, convincing evidence that was legally or factually sufficient to show Park-wood’s gross negligence caused harm to [appellant].” Id. Our sister court initially observed that there was no requirement to show that appellees’ gross negligence caused the appellant’s harm, because “[w]hat lifts ordinary negligence into gross negligence is the defendant’s mental attitude.”' Id. (quoting Newman v. Tropical Visions, Inc., 891 S.W.2d 713, 721 (Tex.App.—San Antonio 1994, writ denied)). Because the appellate court had already determined that the evidence was legally and factually sufficient to warrant the jury’s verdict that the- appellee’s negligence caused Anderson’s harm, the causation element was satisfied. Id. Recognizing, however, that evidence- of simple negligence- is “not enough to prove either the objective or subjective elements of gross negligence,” the court interpreted the issue as a challenge to the sufficiency of the evidence to prove gross negligence by clear and convincing evidence (disregarding appel-lee’s “contentions regarding the sufficiency of the evidence to support a finding of causation of ‘ordinary’ negligence”). Id.
Here, the jury was presented with a broad-form question asking whether'“the negligence, if any, of those named below proximately causefd] the occurrence in *150 question.” The jury was presented with evidence that Rayner’s fatigue proximately caused the accident, and, based—at least in. part—on that evidence, the jury found that both Rayner and Joe Tex were negligent. Neither party objected to the broad-form jury question on any basis, and the sufficiency of the evidence to prove ordinary negligence and proximate cause were not appealed. Joe Tex cannot now claim that Dillon failed to show that Rayner’s fatigue proximately caused the accident. See Tex. Dep’t of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex.1990) (trial court not required to ask jury to specify ground on which it relied to answer question in jury charge); see also Wackenhut Corrs. Corp. v. de la Rosa, 305 S.W.3d 594, 622 (Tex.App.—Corpus Christi 2009, no pet.) (failure to object to form of jury questions limited appellate review to whether any of plaintiffs theories were supported by sufficient evidence), abrogated on other grounds by Zorrilla v. Aypco Const. II, LLC, 469 S.W.3d 143, 157 (Tex.2015); see also Thomas v. Oldham, 895 S.W.2d 352, 360 (Tex.1995) (defendant who did not ask for separate damage findings could only challenge sufficiency of the evidence supporting the whole verdict), Moreover, because the sufficiency of the evidence supporting the jury’s finding on proximate cause was not appealed, we are precluded from reviewing, that issue.
IV. Sufficient Evidence Supports the . Gross-Negligence Finding as to Rayner
Having clarified the issues, we -now examine the record to determine whether sufficient evidence supports the jury’s findings (1) that Rayner’s acts or omissions, when viewed objectively from Rayner’s standpoint at the time the act or omission occurred, involved “an extreme, degree of risk, considering the probability and magnitude of the potential harm to others” and (2) that Rayner was actually, subjectively aware of the risks involved, but nevertheless proceeded in the face of that risk, showing conscious indifference to the rights, safety and welfare of others. Tex Civ. PRAC. & Rem. Code Ann. § 41.001(11)(A), (B).
Rayner testified that he knew that eighteen-wheelers could cause catastrophic injuries. He further acknowledged that it is important to keep accurate log books in order to ensure against driver fatigue, and that the regulations limiting driving time to eleven hours per day and total work time to fourteen hours per day are in place to protect against driver fatigue. Rayner is aware, based on his own experience, that some eighteen-wheeler truck drivers drive while fatigued. Rayner testified that “I suck at logs, sir,” and that he has been sloppy with his log books for years. When Rayner was questioned at trial about one of his many over-hour violations, he responded, “I made a mistake,” but agreed that he had many other over-hour violations. Although Rayner refused to admit that most trucking accidents involve driver fatigue, Setina testified that an eighteen-wheeler driver who drives in excess of eleven hours a day is unsafe because “that’s when they get in accidents and that’s when they catastrophically injure people.” Angie Dunavant, Joe Tex’s chief financial officer, testified that, if a driver continually violates company policy by improperly filling out their log books, people can and will be seriously and catastrophically injured.
Rayner contends that, despite the fact that he was careless with his log book entries, what happened in this case was an act of simple negligence—the act of changing lanes without seeing Dillon. He argues that this act of simple negligence was completely unrelated to any of his incorrect log *151 book entries, stating that “behavior that is merely thoughtless or careless is not malicious or grossly negligent.” N. Am. Van Lines, Inc, v. Emmons, 50 S.W.3d 103, 128 (Tex.App.—Beaumont 2001, pet. denied).
Indeed, aggravating circumstances are required to transform an act of simple negligence into one of gross negligence. In Emmons, for example, the driver of a moving van rear-ended a Ford Bronco in which Emmons was a front-seat passenger, resulting in Emmons’ paralysis. Id. at 112. The jury found that the driver and his employer acted with malice[5] and assessed exemplary damages against the employer. In concluding that the jury’s finding of malice was not supported by legally sufficient evidence, the court noted that the van driver was not driving appreciably faster than other vehicles on the highway and that a witness noticed nothing erratic or unusual about his driving before the collision. Id. at 128, The court further observed that, although the van driver’s failure to observe that the Bronco had stopped was careless and had tragic consequences, that behavior was “merely thoughtless or careless” and was not “malicious or grossly negligent.” Id. Because the driver’s actions did not rise to the level of extreme risk, the finding of malice against him was not supported by legally or factually sufficient evidence. Id. at 127. The employer was therefore not vicariously liable for the finding of malice against its driver.
Rayner contrasts Emmons with this Court’s opinion in USA Truck, Inc. v. West, 189 S.W.3d 904 (Tex.App.—Texarkana 2006, pet. denied). In West, this Court upheld the jury’s malice finding[6] against a tractor-trailer driver who, “[o]n a dark and moonless night, ... backed a seventy-five-foot-long tractor-trailer aeross two lanes of traffic on a four-lane urban highway.” Id. at 908. While the truck driver was engaged in this thirty-to-forty-second maneuver, Condor collided with the side of the trailer and was killed. Id. at 906. A trucking safety expert testified that Condor had the right of way and that the truck driver did not have “any business backing a trailer across his lane of travel in the dark.” Id. at 908. In addition, there was evidence' that the truck driver had driven fourteen hours without taking a break in violation of federal service hour regulations; This excessive time behind the wheel was characterized by the safety expert as “egregious,” and he stated that such conduct would either result in the death of the driver or the death of another. Id.
Rayner believes this case is analogous to Emmons because the record here, he believes, contains none of the type of evidence necessary to show gross negligence, as was present in West. He thus concludes that the evidence fails to show that he posed an extreme risk of serious injury to other drivers on the accident date or that he knew about the peril, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. See Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11).
Dillon sees this evidence as proving that a fatigued tractor-trailer driver 'poses an *152 extreme risk of serious injury to other drivers and that Rayner knew that, driving in his fatigued condition posed this risk, but he chose to drive in such a state knowing of the risk he posed to other drivers. Dillon points to the evidence previously outlined: (1) just three months before the accident, Rayner was cited for nine DOT violations for driving excessive hours,[7] (2) Rayner had thirteen missing log *153 book entries the month before the accident, (3) Rayner’s log book entry, of July 21 reflected that he drove to Mobile, Alabama, but the bill of lading for the shipment he transported on that date showed that he was in Sherman, Texas, and (4) Rayner’s log books both on the day before and on the day of the accident were inaccurate. Additionally, Dillon highlights Ray-ner’s admission that accurate log books are necessary to determine whether a driver is fatigued and that his log books were wrong regarding the day before the accident.[8] He therefore could not tell the jury that he was not fatigued on the day of the accident.
Setina admitted that driving in excess of the maximum hours established by federal regulations results in fatigue, which could lead to accidents in which people are catastrophically injured. Rayner’s fatigued driving of an eighteen-wheeler was more than an act of simple carelessness. This evidence establishes that Rayner’s fatigued driving posed an extreme risk or likelihood of serious injury to other drivers, including Dillon. See Tex. Civ. Peao. & Rem. Code ANN. § 41.001(11)(A).
We turn to the issue of whether Rayner was aware of the risk that his fatigued driving posed an extreme risk of serious injury to other drivers, but nevertheless proceeded in the face of that risk, with conscious indifference to the rights, safety, and welfare of others. See Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11)(B).
Rayner admitted that accurate log books are necessary to determine whether a driver is fatigued, and he could not say that he was not fatigued on the day of the accident. The evidence is undisputed that Ray-ner did not see Dillon’s car before the accident and that he hit her car from behind. Finally, the log book violations reflecting Rayner’s pattern of driving excessive hours, in conjunction with his many years’ of driving experience, is circumstantial evidence that Rayner knew he was fatigued when driving excess hours and that, in doing so, he was risking the lives of others on the road. This evidence, coupled with Rayner’s credibility issues, could lead a reasonable jury to form a firm conviction or belief that Rayner knew.he was fatigued when driving over hours, and that, in doing so, he was risking the lives of others on the road.
As fact-finders,, the jury members were permitted to weigh the evidence and to accept or reject it as they thought proper. See Elbar, Inc. v. Claussen, 774 S.W.2d 45, 50 (Tex.App.—Dallas 1989, writ dism’d) (sufficient evidence to support conclusion that truck driver was fatigued at time of accident, even though in compliance .with DOT regulations). Here, the jury had sufficient evidence on which to form a firm belief or conviction that Rayner was grossly negligent. This Court is not permitted to substitute our judgment for that of the jury, and to do so would place this Court in the untenable position of sitting as a thirteenth juror.
Y. Sufficient Evidence Supports the Gross-Negligence Finding as to Joe Tex
In its charge to the jury, the trial court defined “negligence” to mean
the failure to use ordinary care, that is, failing to do that which a person or company of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have *154 done under the same or similar circumstances. As to Joe Tex Xpress, Inc., “negligence” may also mean entrusting a vehicle to an unlicensed, incompetent and/or reckless driver if Joe Tex Xpress, Inc; knew or should have known that the driver was unlicensed or incompetent or reckless.
The jury found, by clear and convincing evidence, that gross negligence attribute ablé to Joe Tex resulted in the harm to Dillon.[9] We have already determined that Setina’s admission that driving in excess of the maximum hours established by federal regulations results in fatigue, which could lead to accidents in which people are catastrophically injured, is sufficient to establish the objective prong of gross negligence. Stated differently, this evidence establishes that Rayner’s fatigued driving posed an extreme ■ risk or likelihood of serious injury to other drivers, including Dillon. See Tex. Civ. FRAC, & Rem. Code Ann. § 41.001(11)(A). We now examine the evidence to determine whether it is sufficient to support the second prong of gross negligence, i.e., whether Joe Tex knew of an extreme risk of impending harm from allowing Rayner to continue to drive in the face of his repeated over-hour violations, but continued to do so in conscious disregard of the safety of those who might be affected. See Tex. Crv. Pkac, & Rem. Code Ann. § 41.001(11)(B).
Setina testified at length about the April 2010 DOT audit, which resulted in a conditional safety rating for Joe Tex,[10] due in part to the critical violations attributed to Rayner. That rating was in effect at the time of the accident. The audit basically reflected the fact that Joe Tex was “fixing the books and falsifying the records,” and it was fined “thousands of dollars” for doing so. Of the forty-eight violations reflected in the audit, thirty-four were critical and fourteen were nominal. Rayner should have been written up by Joe Tex as a result of the critical violations attributed to him, but he was not. Setina acknowledged that drivers who exceed the eleven-hour driving time limit are unsafe driving an eighteen-wheeler, and Setina knew Rayner exceeded that limit on several occasions, as reflected on the audit. Per the audit, Rayner was the second-worse perpetrator of log book violations, and although some of the “bad offenders” were terminated after the audit, Rayner was not. Setina knew that Rayner was still not turning in all of his logs, even after Joe Tex advised the DOT that it was implementing a new log book audit system on July 1, 2010. Setina also knew that Rayner falsified many log books before the accident.
The Joe Tex log-violations policy called for an oral warning for a first violation, retraining for a second violation within thirty dáys of the last contact with the driver, and a final warning and counseling on a third violation within thirty days of the last contact with the driver. A fourth violation within thirty days of the last contact with the driver required automatic termination. In a form letter sent to each driver committing log-book violations, the driver was told whether the. warning was a first, second, or third and final warning. When asked if the third and final warning meant termination, Setina testified, “It’s my call. It’s my company. I can kind of do what I want.” Setina further testified that he decided whether to follow Joe Tex company policy, stating, “I can choose to over *155 rule things,” and “I can make the policy as I go, and I can change it.” Despite Joe Tex’s policy to document disciplinary actions, there was no- documentation that Rayner had ever been disciplined.
The Joe Tex safety program was designed to ensure that the company does not have fatigued drivers, yet,. Joe Tex failed to document that its drivers—including Rayner—received adequate safety training. EÍunavant testified that, even though the company worked with Rayner regarding his log book violations after the DOT audit, she never felt sure that he was filling out his log books correctly. It is important to log accurately so that the company can total the hours at the end of each week. If log books are inaccurate, there can never be an accurate recording of how many hours are driven each week. If a driver continually violates company policies in an eighteen-wheeler because they are not filling out their log books correctly, people can and will be seriously and catastrophically injured. The most important reason to maintain hours within regulations is to prevent driver fatigue. Craig Skidmore, who did some safety training for Joe Tex- in 2009, testified that fatigue plays a role in most accidents. Ray-ner was involved in two accidents before the audit.
In an open letter addressing improvement in their safety rating after the audit, Joe Tex wrote, “We also have made the tough, but necessary decision to lay-off some of our long-time drivers who were responsible for many of the violations and scoring issues we were encountering.” But, although Rayner was responsible for almost nineteen percent of the violations noted on the audit, he was not laid off.
Some twenty years ago, this Court was faced with a fact situation similar to this case. See Dalworth Trucking Co. v. Bulen, 924 S.W.2d 728, 732 (Tex.App.—Texarkana 1996, no writ). In Bulen, this Court addressed the issue of whether the evidénce supported a jury verdict that Dalworth was grossly negligent in, connection with a fatal accident involving one of its employee drivers. Id. at 731-34. The driver ran a stop sign, killing the occupant of another vehiclé. This Court upheld the verdict as supported by the evidence, although, admittedly, Bulen preceded the advent of the clear-and-convincing-evidence standard of review in assessing evidentiary sufficiency in gross negligence cases.[11] Id. at 734.
There was proof in Bulen that, from July to October 1994, when the accident happened, the driver had committed fifty-five violations of company speed policies, six hours violations, and one missing log violation. Id. at 732. Federal regulations restricted driving hours to not more than seventy hours in eight days. Five of the hours violations occurred within the week preceding the accident. Id. The driver failed to log pre-trip and post-trip inspections, and he was driving more hours than he was logging, which allowed the company to bill the customer for more miles and allowed drivers to be paid for more miles than company time and speed policies allowed. Id. Testimony showed that, although company policy provided that a driver would be discharged after accumulating three safety violations, the driver in that case was not terminated, disciplined, or admonished, and the company did not send him cautionary letters concerning his violations. Id. Although Dalworth was aware of many technical safety violations by its driver, none but the excessive driv *156 ing hours caused or contributed to the wreck. Id. at 733.
The company safety manager testified that company managers were aware of the driver’s over-hour violations, that over-hour driving caused driver fatigue, that fatigue from excessive driving builds up to an almost inevitable loss of alertness in a driver, and that he would give the driver’s overall driving record a grade of “F” as far as safety violations were concerned. The driver had over-hour driving violations , on each of the four days preceding the wreck. The evidence also showed that repeated safety violations by drivers create an extremely dangerous situation, that company managers knew about the situation but did not' suspend, terminate, or admonish the driver, and that to do anything less than that would be inexcusable. The safety manager testified that he knew an accident was almost inevitable if management failed to enforce safety practices vigorously. Id. at 733.
.As in this case, Bulen did not exceed permissible driving hours on the day of the accident. However, on the four days preceding the accident, Bulen violated the hours regulations for each of those days. Even so, the evidence showed that Bulen was not fatigued on the accident date, that he had a good night’s sleep before the day of the accident, and that he had several rest breaks on the accident date. Id.
Based on this evidence, this Court concluded that the jury could have reasonably found that the driver’s cumulative safety violations caused a lack of alertness that contributed to his failure to see the stop sign in time to stop and avoid the collision. This Court further concluded that company managers could have reasonably foreseen a similar consequence from their failure to suspend or discipline the driver. Id. at 734.
As in Bulen, the evidence here shows that Rayner committed numerous log violations, including hours violations that tend to cause fatigue. Here, Rayner’s log book indicates that, two days before the accident, he drove from Dallas to Mobile, but the bill of lading showed that he delivered a load to Sherman on that date. The. trip from Dallas to Mobile, as reflected in the log book, shows exactly eleven hours of driving time. Sometime during that same day, Rayner presumably sidetracked to Sherman. There is no testimony indicating how many excess hours Rayner drove July 21.
We conclude that such evidence was sufficient to permit the jury to form a firm belief or conviction that Joe Tex was aware of the extreme risk of serious injury Ray-ner’s fatigued driving posed to others on the road, yet continued to not only permit, but to tacitly encourage, Rayner to drive in such a state. Setina conceded that Ray-ner had a long history of over-hour violations and that he was aware of those violations well before the accident involving Dillon. Setina also knew that an eighteen-wheeler driver who exceeds driving hours is unsafe, because catastrophic injury can occur. From this testimony, it is apparent that Setina was aware of the fact that Rayner’s driving, by definition, was unsafe every time he exceeded the eleven-hour driving limit. Although company policy required that Rayner’s employment be terminated for his repeated over-hour driving violations, no adverse action was ever taken against him. Instead, Setina callously ignored Rayner’s over-hour violations, stating, “It’s my company. I can kind of do what I want.” Moreover, Joe Tex failed to document that it did anything meaningful about Rayner’s patterns, including providing Rayner adequate safety training. Even after the accident, Joe Tex could not be sure that Rayner was filling out his log books correctly.
*157 This evidence is sufficient to support the jury finding that Joe Tex knew of an extreme risk of impending harm from allowing Rayner to continue to drive in the face of his repeated over-hours violations, with no discipline or admonishment, but continued to do so in conscious disregard of the safety of those who might be affected.
We affirm the trial court’s judgment.

.At trial, Rayner and Joe Tex accepted full responsibility for the accident, and their appeal relates solely to the jury’s determination that they were grossly negligent and to the damages resulting from that determination. The actual damages of $1,110,629.76 were paid before this appeal was filed and are not in issue here.

. After applying the statutory damages cap, the trial court reduced the exemplary damages that the jury assessed against Joe Tex from $3 million to $1,679,259.52. See Tex, Civ. Prac. & Rem, Code Ann, § ,41.008 (West 2015).

. The section of Interstate 30 that runs through Sulphur Springs contains four lanes, with two lanes running east and two lanes running west.

. The Federal Motor Carrier Safety Administration has promulgated regulations for commercial truck drivers. See 49 C.F.R. § 395.3 (West, Westlaw current through July 7, 2016). These regulations generally provide that a driver is permitted to work fourteen hours per day, but can drive .for only eleven of those fourteen hours. 49 C.F.R. 395.3.

. At the time of the accident, the statutory definition of "malice” included an alternative gross negligence component. The jury was instructed with this definition of malice. Em-mons, 50 S.W.3d at 127. Currently, malice is defined solely as "a specific intent by the defendant to cause substantial injury or harm to the claimant.” Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7) (West Supp. 2015).

. As in Emmons, the definition of "malice” in West is currently the statutory definition of “gross negligence.” See Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11) (West Supp, 2015),

, The April 2010 DOT audit of Joe Tex reflects that Rayner was cited with six critical violations and three nominal violations of DOT regulations. The critical violations reflect that:
• On or about 02/04/2010, Joe Tex Xpress Inc used driver, Dennis Rayner, to drive a commercial , motor vehicle in , interstate commerce from Blytheville, AR to Conway, AR. The driver made a false report of duty activities on the record of duty status for that date. The driver’s record of duty status is false because on 02/04/2010 Comdata fuel report shows driver Dennis Rayner fueling in Calera, OK at 7:07 PM (CT). On 02/04/2010 log book shows driver Dennis Rayner shows arriving in Cleburne, TX at 7:30 PM (CT) and going off duty between 7:30 PM (CT) and midnight. As per PC miler, Cleburne, TX to Calera, OK is approximately 138 miles and 2 hours and 25 minutes from each other.
• On or about 02/05/2010, Joe Tex Xpress Inc used driver, Dennis Rayner, to drive a commercial motor vehicle in interstate commerce from Cleburne, TX to Fourchon, LA. The driver made a false report of duty activities on the record of duty status for that date. The driver’s record of duty status is false because on 02/05/2010 Comdata fuel report shows driver Dennis Rayner fueling in Vinton, LA at 9:45 PM (CT). On 02/05/2010 log book shows driver Dennis Rayner shows off duty all day in Cleburne, TX. As per PC miler, Vinton, LA to Cle-burne, TX is approximately 395 miles and 6 hours and 4 minutes from each other.
• On or about 02/09/2010, Joe Tex Xpress Inc used driver, Dennis Rayner, to drive a commercial motor vehicle in interstate commerce from Tylertown, MS to Houston, TX. The driver made a false report of duty activities on the record of duty status for that date. The driver’s record of duty status is false because on 02/09/2010 Comdata fuel report shows driver Dennis Rayner fueling in Van, TX at 5:57 PM (CT). On 02/09/2010 log book shows driver Dennis Rayner driving from Pauls Valley, OK and Periy, OK between 5:30 PM (CT) and 7:00 PM (CT). As per PC miler, Pauls Valley, OK to Van, TX is approximately 236 miles and 3 hours and 30 minutes from each other. As per PC miler, Perry, OK to Van, TX is approximately 351 miles and 5 hours from each other.
• On. or about 02/11/2010, Joe Tex Xpress Inc used driver, Dennis Rayner, to drive a commercial motor vehicle in interstate commerce from Kimball, NE to Sherman, TX. The driver made a false report of duty activities on the record of duty status for that date. The driver's record of duty status is false because on 02/11/2010 Comdata fuel report shows driver Dennis Rayner fueling in North Platte, NE at 1:49 PM (CT). On 02/11/2010 log book shows driver Dennis Rayner going off duty in Aurora, NE between 2:00 PM (CT) and 3:00 PM (CT). As per PC miler, North Platte, NE to Aurora, NE is approximately 159 miles and 2 hours and 13 minutes from each other.
• On or about 02/26/2010, Joe Tex Xpress Inc used driver, Dennis' Rayner, to drive a commercial motor vehicle in interstate commerce from Blanco, NM to Ingleside, TX. The driver made a false report of duty activities on the "record of duty status for that date. The driver’s record of duty status is false because on 02/26/2010 Comdata fuel report shows driver Dennis Rayner fueling in Moriarty, NM at 6:04 PM (CT). On 02/26/2010 log book shows driver Dennis Rayner off duty in Corpus Christi, TX between 6:30 PM (CT) and midnight. As per PC miler, Corpus Christi, TX to Moriarty, NM is approximately 833 miles and 13 hours and 58 minutes from each other.
• On or about 02/28/2010, Joe Tex Xpress Inc used driver, Dennis Rayner, to drive a commercial motor vehicle in interstate commerce from Blanco, NM to Ingleside, TX. The driver made a false report of duty activities on the record of duty status for that date. The driver's record of duty status is false because on 02/28/2010 Comdata fuel report shows driver Dennis Rayner fueling in San Antonio, TX at 7:18 AM (CT). On 02/28/2010 log books shows driver Dennis Rayner off duty all day in Corpus Christi, TX. As per PC miler, Corpus Christi, TX to San Antonio, TX is approximately 145 miles and 2 hours and 8 minutes from each other.

. This was not a big time discrepancy. The weight ticket for that date indicated that his truck was loaded at 9:19 a.m., yet the log book showed that Rayner was off duty at 9:22 a.m.

. Both "clear and convincing evidence" and "gross negligence" were appropriately defined.

. A trucking company can be rated as satisfactory, conditional, or unsatisfactory by the DOT.

. The verdict against Dalworth was upheld despite the jury’s finding that the driver was not grossly negligent.